RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MANUEL GUZMAN-VAZQUEZ,

*Petitioner,*

No. 19-3417

*v.*

WILLIAM P. BARR, Attorney General,

*Respondent.*

─────────────────

On Petition for Review from the Board of Immigration Appeals;
No. A 206 154 087.

Decided and Filed:  May 18, 2020

Before:  MERRITT, MOORE, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  R. Andrew Free, LAW OFFICE OF R. ANDREW FREE, Nashville, Tennessee, for Petitioner.  Patricia E. Bruckner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

MOORE, J., delivered the opinion of the court in which MERRITT, J., joined. MURPHY, J. (pp. 30–51), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Manuel Guzman, a native and citizen of Mexico, petitions for review of the decision of the Board of Immigration Appeals ("BIA") affirming an immigration judge's denial of his application for withholding of removal.[1] Because the IJ and BIA erred in failing to give Guzman an opportunity to explain why he could not reasonably obtain certain corroborative evidence, because substantial evidence does not support the Immigration Judge ("IJ") and BIA's determinations regarding the unavailability of evidence to corroborate Guzman's claim about abuse by his stepfather, and because the BIA incorrectly required Guzman to demonstrate that his membership in a particular social group was "at least one central reason" for his persecution, we **GRANT** the petition for review, **VACATE** the BIA's order, and **REMAND** for proceedings consistent with this opinion.

## I. BACKGROUND

Manuel Guzman is a native and citizen of Mexico who has lived in the United States for over twenty years. Administrative Record ("A.R.") at 177 (Appl. for Withholding at 1). After leaving home at age 14, he crossed the border between Mexico and California at 17 and has not returned to Mexico since. *Id.*; *id.* at 106 (Removal Proceedings Tr. ("Hr'g Tr.") at 26). On July 17, 2014, the Department of Homeland Security served him with a notice of hearing for removal proceedings. *Id.* at 1010 (Notice of Hr'g). On July 18, 2016, Guzman applied for asylum, withholding of removal under § 241(b)(3) of the Immigration and Nationality Act ("INA"), and withholding and deferral of removal under the Convention Against Torture. *Id.* at 91 (Hr'g Tr. at 12); *id.* at 41 (IJ Order).

---

[1]At most points throughout the petitioner's brief, he is referred to as "Guzman," rather than Guzman-Vazquez. Accordingly, we refer to him in this opinion as "Guzman."

**A. The Hearing**

At the hearing on his application for relief from removal, Guzman testified to the following information. He was born in the town of Estanzuela Grande in Oaxaca, Mexico. *Id.* at 117 (Hr'g Tr. at 37); *id.* at 177 (Appl. for Withholding at 1). He has one biological sister. *Id.* at 118 (Hr'g Tr. at 38); *id.* at 180 (Appl. for Withholding at 4). In his hometown, his family faced violence at the hands of another family, who murdered both his father and grandfather. *Id.* at 148 (Hr'g Tr. at 68). After his father was killed, when Guzman was one year old, he and his mother moved to a different town, San Pedro Mixtepec, which was about six hours away. *Id.* at 110; *id.* at 180 (Appl. for Withholding at 4).[2]

In San Pedro Mixtepec, Guzman suffered mistreatment at the hands of his mother and stepfather. *Id.* at 105–06, 147 (Hr'g Tr. at 25–26, 67). He explained that his mother cared more about her stepchildren, and that "she can't worry about her kids with her relationship with her husband." *Id.* at 127. Guzman testified that his stepfather regularly subjected him to physical abuse, as follows:

> He usually get a, a rope, a root, he cut a root from the, the, the shores at the top of the dirt because he know that is not going to break. He used to mark my whole body whenever I take shower one day my mother see my back, how hurt I was. . . . I told him one day that I cannot take it no more because I was hurt, so I started running, he chased me, he chased me, so I tried to go under the fence, but I got stuck, and he hurt me worse.

*Id.* at 128. Guzman stated that his stepfather would "look for any reason" to hit him. *Id.* at 140. He also testified that his stepfather hit his sister, *id.* at 140, and that when his mother tried to stop his stepfather from abusing him, "she got hurt, too, for the same reason, for she talking to him about me." *Id.* at 128; *see also id.* at 144 ("[S]he know that I can get hurt by the -- by, by him because she know how she, how she got treated by the -- by this man because of me."). At the same time, according to Guzman, his mother abused him, doing the "[s]ame thing my step-dad did, because he like a repeat." *Id.* at 147. No one reported the stepfather's abuse because he was in charge of the political subdivision where they lived. *Id.* at 108–09.

---

[2]The name of this town is spelled incorrectly in both the hearing transcript and Guzman's application for withholding. *See* U.S. DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, SPANISH NAME BOOK 85, 131 (1973) ("San Pedro Mixtepec").

When Guzman left home at age 14, his mother and stepfather told him never to set foot on their property again. *Id.* at 126. Three years later, his aunt gave him a "deal" to come to the United States, *id.* at 106, where he has lived since 1998, *id.* at 177 (Appl. for Withholding at 1). He testified that he fears returning to Mexico for several reasons. First, he fears that his stepfather, who still has connections to the police and harbors resentment toward him for abandoning the family, would kill him. *Id.* at 129, 145 (Hr'g Tr. at 49, 65); *id.* at 140 ("He's still looking for me."). Second, he fears that the individuals who murdered his family members would believe, if he returned, that he had come to avenge his father's death, and would try to kill him. *Id.* at 150; *id.* at 114–15 (explaining that these individuals murdered his cousin a few months before the hearing).

Because Guzman did not present affidavits from family members in support of his application for relief, portions of the hearing dealt with the whereabouts of these individuals and how frequently Guzman communicates with them. First, he testified that he last spoke between two to four weeks before the hearing with an uncle who fled Estanzuela Grande for the United States to escape the violence that their family faced and now lives in New Jersey. *Id.* at 112–13. Guzman offered no explanation for why he had not asked this uncle to write a statement for him. *Id.* at 113. Second, he stated that he has an aunt who lives "about an hour away from where [his] dad used to live," with whom he exchanges text messages "every week, every other week." *Id.* at 124–25. When asked why this aunt had not provided a statement for him about continued threats from the individuals in Estanzuela Grande who have harmed his family members, Guzman did not offer an explanation. *Id.* at 124–25. Third, with respect to his sister, who still lives in Mexico, he stated that "where she live there's really no communication, so that's the reason I'm not really talk to her." *Id.* at 142. He continued:

> We talk like maybe once a year. Now where she live is no, no communication so she had to walk, I think 30 minutes, 40 to an hour to, to -- where she can go to a public phone, I mean to a store where she can pay for a phone, so this is why I not really talk to her.

*Id.* at 142. Finally, with respect to his mother, with whom he had last spoken two weeks ago, he said he could "try[] getting a letter from her," but that he had not already done this because she was unable to write. *Id.* at 127, 142–43. He added that "the same reason, communication

problems" explained why he did not have a letter from his uncle in Mexico, *id.* at 143, who remains in Estanzuela Grande, *id.* at 114.

## B.  The Immigration Judge's Decision[3]

The immigration judge found that although Guzman was "generally credible," his testimony alone was insufficient to sustain his burden of proof without corroboration.  A.R. at 43 (IJ Decision at 2).  The IJ further found that Guzman "should have and could have produced corroborative evidence."  *Id.*  With respect to corroboration of his claim that his stepfather abused him, the IJ found that this claim was "easily subject to verification."  *Id.* at 45.  Addressing Guzman's explanation for why he lacked such verification, the IJ stated:

> The respondent offered an explanation by way of the fact that it would be hard or difficult to communicate with his sister and get the information, and where the Court understands that and appreciates it, the respondent's testimony was that he was still in contact with his sister, that he's in contact with his mother, that he's in contact with his aunt, that he's in contact with his uncle, all the people that could provide corroboration, yet no corroboration has been provided to corroborate the details of the respondent's claim.

*Id.*  The IJ then stressed the importance of corroboration on the issue of Guzman's stepfather's political influence, given Guzman's young age and potentially incomplete memory at the time of the alleged abuse.  *Id.*  Corroboration of the claim that there was a relationship between Guzman's stepfather and the "police or town management," the IJ found, could have come from Guzman's sister, his mother, "or any other sort of documentation in the town, or from the town."  *Id.* at 45–46.  Additionally, the IJ found that there was insufficient evidence in the record "that the step-father exi[s]ts, that he is, in fact, married to the mother, and that there is a step-father relationship with the respondent."  *Id.* at 46.  These claims, too, the IJ found, were "easily subject to verification . . . through, at least, a letter from his sister."  *Id.*

---

[3]The following account of the IJ's oral decision includes only those portions relevant to the present petition for review.  For example, the IJ explained why Guzman had not demonstrated exceptional circumstances exempting him from the one-year filing deadline for asylum applications, A.R. at 47–48 (IJ Decision at 6–7), but Guzman does not challenge this determination in the present petition.  Nor does the petition challenge any of the factual or legal determinations relating to the threat he faced as a male relative of his father, Javier Guzman-Romero (Guzman's claims are limited to the rulings relating to his stepfather's abuse), so this section omits the IJ's discussion of this issue.

After finding that the abuse Guzman suffered at his stepfather's hands rose to the level of persecution under the INA and that Guzman was a member of two particular social groups—(1) male relatives of Javier Guzman-Romero (his biological father) and (2) children born to his mother and Javier Guzman-Romero—the IJ concluded that Guzman could not establish that he had suffered harm on account of his membership in these groups. *Id.* at 48–50. Instead, the IJ found that Guzman was "the victim of a[n] individual motivated by depravity and crime, and that he was abused by a thug, a bully and a criminal." *Id.* at 50. The IJ found that Guzman had a "fear of criminality." *Id.* The IJ alternatively concluded that there had been a change in circumstances in Guzman's life—namely the passage of time rendering his dependency on his stepfather moot—which left his past-persecution claim nonviable. *Id.* at 50–51. The IJ also concluded that Guzman could not establish a well-founded fear of future persecution. *Id.* at 51–53.

The IJ denied Guzman's applications for asylum, withholding of removal under § 241(b)(3) of the INA, and withholding and deferral of removal under the Convention Against Torture, and ordered him removed from the United States to Mexico. *Id.* at 41 (IJ Order). Guzman appealed this decision to the BIA.

## C. The BIA's Decision

The BIA adopted the reasoning of the IJ.**[4]** In particular, the BIA concluded that Guzman did not adequately explain why he could not obtain affidavits from his aunt, sister, or mother "since he remains in contact with them." A.R. at 5 (BIA Decision at 3). It also concurred with the IJ that even if there had been adequate corroboration, the harm perpetrated on Guzman "was not based on his membership in [a particular social group]." *Id.* Finally, the BIA rejected Guzman's argument that he could satisfy the nexus requirement by demonstrating that his stepchild status was "at least" one factor causing his persecution, explaining that "that lower

---

**[4]**Twice in its opinion, the BIA erroneously stated that Guzman's proposed social group was male relatives of his *stepfather*. *See* A.R. at 3, 4 (BIA Decision at 1, 2). In fact, Guzman alleged that he had been targeted because he belonged to the group comprising male relatives of his *biological* father. The BIA's opinion makes clear, however, that it correctly understood Guzman to be arguing that he was targeted as a member of his biological father's family and that "'his step-child status was at least one factor causing his persecution.'" *Id.* at 5 (quoting Resp. Br. at 7). The errors are therefore harmless.

burden of proof for nexus has not been adopted by the United States Court of Appeals for the Sixth Circuit." *Id.* Instead, Guzman was required to demonstrate that his stepchild status was a "central reason" for the harm he suffered. *Id.* at 6 & n.3 (citing *Matter of C-T-L-*, 25 I. & N. Dec. 341 (2010)). The BIA therefore dismissed his appeal. *Id.*

Guzman timely petitioned this court for review. We have jurisdiction to review the BIA's decision pursuant to 8 U.S.C. § 1252(a)(1).

## II. STANDARD OF REVIEW

"Where, as here, the BIA reviewed the IJ's decision *de novo* and issued its own separate opinion, we review the BIA's opinion as the final agency determination." *Hassan v. Holder*, 604 F.3d 915, 924 (6th Cir. 2010). "However, to the extent the BIA adopted the immigration judge's reasoning, this court also reviews the immigration judge's decision." *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015).

"This Court reviews both the immigration judge's and the BIA's factual findings under the substantial-evidence standard." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "The substantial-evidence standard requires us to defer to the agency's findings of fact 'if supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012) (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (citations omitted)). "These findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Ben Hamida v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review questions of law de novo. *Giraldo v. Holder*, 654 F.3d 609, 611 (6th Cir. 2011). Still, "[w]e defer to the BIA's interpretation of the statutes and regulations it administers, so long as the interpretation is reasonable." *Gaye v. Lynch*, 788 F.3d 519, 526 (6th Cir. 2015).

## III. DISCUSSION

This petition raises several questions. First, did the IJ and BIA correctly apply the corroboration requirement set forth in 8 U.S.C. § 1158(b)(1)(B)(ii)? Second, did substantial evidence support the IJ's and BIA's determination that Guzman inadequately explained why he

failed to corroborate his past-persecution claim involving his stepfather? Third, did the IJ and BIA apply the proper construction of 8 U.S.C. § 1231(b)(3)(C) (the withholding statute) in requiring Guzman to demonstrate that his stepchild status was "at least one central reason" why his stepfather abused him? The answer to each of these questions is no.

## A. Application of § 1158(b)(1)(B)(ii)

Guzman first argues that the IJ and BIA erred as a matter of law in applying 8 U.S.C. § 1158(b)(1)(B)(ii), which governs the burden of proof for a withholding claim. The statute reads in relevant part:

> Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

*Id.* Guzman argues that under this court's interpretation of the statute in *Gaye v. Lynch*, 788 F.3d 519, 530 (6th Cir. 2015), "applicants seeking humanitarian protection must divine in advance of their testimony whether an IJ will deem them credible and consistent enough to be able to carry their burden without supplying corroborating evidence." Pet. Br. at 17. Guzman also stated in his notice of appeal from the IJ's decision that the IJ "erred as a matter of law in holding corroboration was required," A.R. at 35 (Notice of Appeal from IJ Decision at 2), and argued in his brief to the BIA that the IJ "speculated as to the availability of witness testimony," A.R. at 21 (Resp. Br. at 8). For the following reasons, we conclude that the IJ did not err in failing to give notice of the specific corroborating evidence that would be considered persuasive to meet Guzman's burden of proof, but did err, in part, in requiring certain corroborative evidence without giving Guzman an opportunity to explain why it was not reasonably available.

Our decision in *Gaye* analyzed the question of notice under § 1158(b)(1)(B)(ii) and held that "federal law does not entitle [an individual in removal proceedings] to notice from the Immigration Court as to what sort of evidence the [individual] must produce to carry his burden." 788 F.3d at 530. This decision "remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d

685, 689 (6th Cir. 1985).  As a matter of circuit precedent, Guzman was not entitled to notice that the IJ would require him to corroborate his claims with other evidence.**5**

*Gaye* did not, however, address the question of an applicant's opportunity to explain why corroborative evidence is not reasonably available, when the IJ has deemed such evidence necessary to satisfy the individual's burden of proof.  *See* 788 F.3d at 529–30.  Following the plain language of the statute, the BIA's interpretation of it, and the interpretations of our sister circuits on this issue, we conclude without difficulty that an IJ may not require corroborative evidence without giving the applicant an opportunity to explain its absence.  Start with the statutory text, which operates sequentially.  "Where" the IJ determines that "otherwise credible testimony" needs corroboration, then the evidence must be provided unless the applicant cannot reasonably obtain it.  8 U.S.C. § 1158(b)(1)(B)(ii).  The requirement, set forth in the latter clause, is triggered by the occurrence of the former clause, a "determinat[ion]" by the IJ.  That is, *after* or *upon* or *in the case of* the IJ's determination, corroborative evidence must thereafter be provided, unless the applicant can explain why the evidence is not reasonably available.  The syllogistic nature of this provision is unambiguous.

Yet our conclusion that the applicant must be given the chance to explain why corroborative evidence is not reasonably available would be the same even if the statutory language were ambiguous and we deferred to the BIA, *see INS v. Aguirre–Aguirre*, 526 U.S. 415, 424 (1999), because the agency interprets the statute identically on this point.  Prior to the enactment of the REAL ID Act of 2005, the BIA explained that "[b]ecause the burden of proof is on the [applicant], an applicant should provide supporting evidence, both of general country conditions and of the specific facts sought to be relied on by the applicant, where such evidence is available."  *In Re S-M-J-*, 21 I. & N. Dec. 722, 724 (BIA 1997).  However, "[i]f such evidence is unavailable, the applicant must explain its unavailability, *and the Immigration Judge must*

---

**5**Guzman also challenges the constitutionality of *Gaye*'s interpretation of § 1158(b)(1)(B)(ii).  *See* Pet. Br. at 15 ("The IJ and BIA deprived Guzman of his Fifth Amendment right to due process in removal proceedings by misapplying the Real ID Act of 2005's corroboration requirement.").  *Gaye* did not address the constitutionality of this statute, nor has any court since *Gaye* determined whether the provision—as construed in *Gaye*—comports with Fifth Amendment protections.  Given that we resolve this case on other grounds, however, we decline to opine on the constitutionality of this statute.  *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)).

*ensure that the applicant's explanation is included in the record*." *Id.* (emphasis added). Congress thereafter explicitly adopted the standards set forth in *In Re S-M-J-* in enacting the REAL ID Act. *See* H.R. CONF. REP. 109-72, at 166, *as reprinted in* 2005 U.S.C.C.A.N. 240, 292 ("Congress anticipates that the standards in *Matter of S–M–J–*, including the BIA's conclusions on situations where corroborating evidence is or is not required, will guide the BIA and the courts in interpreting this clause."). Accordingly, following the REAL ID Act's enactment, the BIA reaffirmed that *In Re S-M-J-*'s requirement of an opportunity to explain the absence of corroborative evidence still controlled:

> Where credible testimony alone is determined to be insufficient, an applicant for asylum or withholding of removal bears the burden to provide reasonably available supporting evidence for material facts that are central to his claim and are easily subject to verification. *Matter of S–M–J–*, 21 I. & N. Dec. at 725. *If the evidence is unavailable, the Immigration Judge must afford the applicant an opportunity to explain its unavailability and ensure that the explanation is included in the record.*

*Matter of L-A-C-*, 26 I. & N. Dec. 516, 519 (BIA 2015) (emphasis added). This did not mean that the IJ was required to give "advance notice of the need for specific corroborating evidence," *id.* at 520, as we subsequently recognized in *Gaye*, *see* 788 F.3d at 530 ("This text does not suggest that the alien is entitled to notice from the IJ as to what evidence the alien must present."). But on the question of explaining the absence of such evidence, the BIA reiterated that "*[a]t the merits hearing*, in circumstances where the Immigration Judge determines that specific corroborating evidence should have been submitted, the applicant should be given an opportunity to explain why he could not reasonably obtain such evidence." *Matter of L-A-C-*, 26 I. & N. Dec. at 521 (emphasis added).

Our sister circuits have reasoned similarly. For example, the Eighth Circuit recently adopted the same, twofold interpretation of § 1158(b)(1)(B)(ii), relying on *Matter of L-A-C-*. In *Uzodinma v. Barr*, 951 F.3d 960 (8th Cir. 2020), the court explained that "[a]t a merits hearing, the IJ need not identify the specific corroborating evidence that would be persuasive[,] [n]or must the IJ grant an automatic continuance for the applicant to present corroborating evidence later." *Id.* at 966 (citing *Matter of L-A-C-*, 26 I. & N. Dec. at 520); *see also Gaye*, 788 F.3d at 530. However, "[w]hen an asylum applicant must provide corroborating evidence,

the IJ must afford an opportunity to explain its unavailability, ensuring the explanation is in the record." *Uzodinma*, 951 F.3d at 966 (citing *Matter of L-A-C-*, 26 I. & N. Dec. at 521–22). Other circuits have gone further, holding that under § 1158(b)(1)(B)(ii), an applicant is entitled not only to an opportunity to explain the absence of corroborative evidence, but also to notice from the IJ as to what type of corroboration will be expected, *see Chukwu v. Attorney Gen. of U.S.*, 484 F.3d 185, 192 (3d Cir. 2007); *Ren v. Holder*, 648 F.3d 1079, 1090–93 (9th Cir. 2011).[6]

No circuit has held that an IJ may rule against an applicant on the basis of failing to provide corroborative evidence when the applicant has not had the chance to explain its absence. For example, in *Rapheal v. Mukasey*, 533 F.3d 521 (7th Cir. 2008), the Seventh Circuit rejected the same type of notice requirement that we rejected in *Gaye*, but was *not* faced with a scenario in which the petitioner had been given no opportunity by the IJ to explain the absence of corroborative evidence, and did not opine on this issue. Indeed, the court recounted how the IJ explicitly asked the applicant why he had not produced specific pieces of corroborative evidence. *See id.* at 529 ("[IJ]: And ma'am, if [your father] is so well-known in Liberia, why have you not been able to present anything to me, to show that he was well-known in Liberia? A: Because I didn't leave home in peaceful home. I didn't left home with peace. [IJ]: Well, is there any information anywhere in the media regarding your family in Liberia? A: I wouldn't know. I wouldn't know."). Similarly, in *Wei Sun v. Sessions*, 883 F.3d 23 (2d Cir.), *cert. denied*, 139 S. Ct. 413 (2018), the Second Circuit explained that "the IJ should perform the following analysis: (1) point to specific pieces of missing evidence and show that it was reasonably available, (2) *give the applicant an opportunity to explain the omission*, and (3) assess any explanation given," though it added that "we require an IJ to specify the points of testimony that require corroboration, [but] we have not held that this must be done *prior* to the IJ's disposition of the alien's claim." *Id.* at 31 (citing *Liu v. Holder*, 575 F.3d 193, 198 (2d Cir. 2009)) (first emphasis added). And in *Avelar-Oliva v. Barr*, 954 F.3d 757 (5th Cir. 2020), the Fifth Circuit recently considered whether to "part ways" with "the BIA's rejection of the advance notice and automatic continuance requirements." *Id.* at 770. The court—"join[ing] the Second, Sixth, Seventh, and Eighth Circuits"—"reject[ed] the notion that an IJ, prior to disposing of an alien's claim, must

---

[6]The merits of this approach notwithstanding, it is foreclosed by our decision in *Gaye*.

provide additional *advance* notice of the specific corroborating evidence necessary to meet the applicant's burden of proof and an *automatic* continuance for the applicant to obtain such evidence," *id.* at 771, but did not opine on the question of an applicant's opportunity to explain the absence of corroborating evidence, apart from acknowledging the BIA's position that an applicant must have "an opportunity to explain why he could not reasonably obtain such evidence," *id.* at 770 (quoting *Matter of L-A-C-*, 26 I. & N. Dec. at 521). Finally, the First Circuit—citing the Third Circuit's decision in *Chukwu*—held that "before the failure to produce corroborating evidence can be held against an applicant, there must be explicit findings that (1) it was reasonable to expect the applicant to produce corroboration and (2) the applicant's failure to do so was not adequately explained." *Soeung v. Holder*, 677 F.3d 484, 488 (1st Cir. 2012) (citing *Chukwu*, 484 F.3d at 191–92). This holding presumes that an applicant has received some opportunity to "adequately explain[]" his failure to produce corroborating evidence.

From the plain language of § 1158(b)(1)(B)(ii), the BIA's interpretation of it, and the foregoing analyses of our sister circuits, we conclude that an IJ may not rule against a petitioner on the basis of his failure to produce corroborative evidence when he has been given no opportunity to explain its absence. The question here is whether the IJ in fact "speculated as to the availability of witness testimony" and other corroborative evidence without giving Guzman an opportunity to explain the unavailability of such corroboration. A.R. at 21 (Resp. Br. at 8). Viewing the administrative record as a whole, it is clear that for some of the IJ's findings as to Guzman's failure to produce corroborative evidence, Guzman did have an opportunity to explain the absence of such evidence. For instance, while questioning Guzman about abuse by his stepfather, counsel for DHS asked Guzman about why he had failed to produce evidence to corroborate his testimony, and Guzman responded. A.R. at 142 (Hr'g Tr. at 62). Counsel for DHS also asked him about corroboration from individuals who had been experiencing threats in Guzman's hometown, and again Guzman responded. *See id.* at 143 (Hr'g Tr. at 63). Although, as discussed above, the plain language of § 1158(b)(1)(B)(ii) suggests that the applicant is required to explain the absence of corroborative evidence only if the IJ has first determined that such evidence is necessary, here it is clear that Guzman had the opportunity to account for the unavailability of certain evidence, even without the IJ himself developing the record. *See In Re S-M-J-*, 21 I. & N. Dec. at 726 ("Although the burden of proof in establishing a claim is on the

applicant, the Service and the Immigration Judge both have a role in introducing evidence into the record."). Our review of whether an applicant had the opportunity to explain why certain corroborative evidence was absent does not depend formulaically on whether the IJ or another party asked about the availability of such evidence.

As to evidence corroborating Guzman's testimony that "the step-father exi[s]ts, that he is, in fact, married to the mother, and that there is a step-father relationship with the respondent," A.R. at 46 (IJ Decision at 5), by contrast, Guzman had no opportunity to explain the absence of such evidence prior to the IJ's decision. No one—not Guzman's counsel, not counsel for DHS, and not the IJ—ever suggested a need for corroboration of these alleged facts prior to the IJ's decision. To be clear, the IJ was not required to give notice in advance of the hearing "as to what sort of evidence [Guzman] [had to] produce to carry his burden." *Gaye*, 788 F.3d at 530. Although Guzman likely did not anticipate the need to bring to the removal proceedings a copy of his stepfather's passport or an affidavit from a family member stating, "Guzman's stepfather exists," under our precedent, the IJ was permitted to require such evidence of Guzman without giving him prior notice. But because the IJ relied on Guzman's failure to provide corroborative evidence on these facts, he was required to "afford [Guzman] an opportunity to explain its unavailability and ensure that the explanation is included in the record." *Matter of L-A-C-*, 26 I. & N. Dec. at 519. As the Third Circuit has aptly stated, "it is impossible for us to determine whether 'a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence is unavailable,' 8 U.S.C. § 1252(b)(4)(D), unless a petitioner is given the opportunity to testify as to its availability." *Toure v. Attorney Gen. of U.S.*, 443 F.3d 310, 325 (3d Cir. 2006). In this case, the IJ did not afford Guzman an opportunity to explain why evidence corroborating the existence of his stepfather, for example, was not reasonably available, nor did any of the direct- and cross-examination of Guzman elicit such an explanation for the record. Accordingly, the IJ and BIA erred by basing their rulings against Guzman, in part, on his failure to corroborate the existence of his stepfather, the stepfather's marriage to Guzman's mother, and the stepfather's relationship with Guzman, when he was given no opportunity to explain why evidence corroborating these facts was not reasonably available.

**B.  Substantial Evidence and Corroboration**

We turn to the question of whether substantial evidence supported the IJ's and BIA's determination that Guzman inadequately explained why he failed to corroborate his past-persecution claim involving his stepfather.  Section 1229a(c)(4)(B) as amended by the REAL ID Act provides:

> Where the immigration judge [in removal proceedings] determines that the applicant should provide evidence [that] corroborates otherwise credible testimony, such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence.

8 U.S.C. § 1229a(c)(4)(B); *see also* 8 U.S.C. § 1158(b)(1)(B)(ii) (sustaining burden of proof for asylum and withholding claims).  "A reviewing court may not reverse an agency finding as to the availability of corroborating evidence unless the court finds a reasonable trier of fact would be compelled to conclude that such evidence is unavailable." *Fisenko v. Holder*, 336 F. App'x 504, 510 (6th Cir. 2009) (citing 8 U.S.C. § 1252(b)(4)).  Even when the immigration judge finds an applicant's testimony to be credible, as here, if "the agency determines that an applicant should provide corroborating evidence, . . . corroborating evidence is required unless the applicant cannot reasonably obtain that evidence." *Urbina-Mejia v. Holder*, 597 F.3d 360, 367 (6th Cir. 2010).

The issue in this case, therefore, is not whether the IJ sufficiently explained why corroborative evidence was important.  With respect to the issue of Guzman accurately recalling the extent of his stepfather's connections to governmental authorities, for example, we do not question the IJ's conclusion that "the Court would not expect a 14-year-old memory would be such that he would know exactly what his step-father did, was involved in or how he was affiliated with the village or town."  A.R. at 45 (IJ Decision at 4).  Our review is limited to the question of whether the IJ's and BIA's determination that Guzman failed to demonstrate why corroborative evidence was unavailable was supported by substantial evidence.  The INA sets forth in unmistakable terms how we review this question:  "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the

court finds, pursuant to subsection (b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4). Conversely, if we determine that this is "a case where the applicant's testimony is the only evidence available," then "the immigration judge's contrary conclusion"—requiring the applicant to adduce corroborative evidence in order to satisfy his burden of proof—"must be reversed." *Urbina-Mejia*, 597 F.3d at 368 n.4.

As the pages of the Federal Appendix illustrate, we are often confronted with cases in which applicants for relief from removal simply provided no reason to the IJ or BIA for their failure to adduce probative testimony or affidavits from relevant witnesses. *See, e.g.*, *Dragnea v. Lynch*, 624 F. App'x 365, 370 (6th Cir. 2015) ("Dragnea gives no reason for [three relevant witnesses'] unavailability. He therefore fails to compel a conclusion that corroborating evidence was unavailable."); *Brushtulli v. Holder*, 594 F. App'x 282, 287 (6th Cir. 2014) ("Brushtulli has given no reason why he did not or could not obtain corroborating statements from his uncles or other relatives who were aware of the incidents that occurred when he was a child."); *Yanyun Ni v. Holder*, 556 F. App'x 466, 470 (6th Cir. 2014) ("Statements from either or both of these individuals could have substantiated many of Ni's claims, yet no explanation was offered as to why they were unavailable to provide evidence."); *Ying Chen v. Holder*, 580 F. App'x 332, 341 (6th Cir. 2014) ("Chen never provided the IJ or the BIA with any explanation as to why these materials, or other corroborating evidence, were not provided."); *Gjoni v. Gonzales*, 168 F. App'x 54, 59 (6th Cir. 2006) ("[A]t the removal hearing, Gjoni did not provide any reasonable explanation for the absence of this corroborating evidence. Gjoni merely stated that he believed that providing the testimony of his family members to corroborate his account of the persecution he suffered would not further his claim and thus he did not call his brothers as witnesses at the hearing or provide affidavits from his parents or sister.").

This is no such case. As to the only two individuals who, according to the record, had knowledge of the stepfather's abuse, Guzman provided compelling explanations for their failure to corroborate his testimony. With respect to his sister, Guzman explained that "there's really no communication" where she lives in Mexico, and she has to walk between 30 minutes to one hour in order to pay for a phone. A.R. at 142 (Hr'g Tr. at 62). Because of this, he only spoke to her

"maybe once a year." *Id.* Based on this testimony, which the IJ found credible—and which offered far more by way of explanation than "stating only that he had lost contact with [his sister]," *see Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009)—Guzman cannot have been reasonably expected to have solicited and procured an affidavit from his sister.[7] This stands in stark contrast to cases in which applicants for relief fail to provide corroboration from relevant witnesses with whom they are in frequent—or at least regular or reliable—contact. *See, e.g.*, *Urbina-Mejia*, 597 F.3d at 363 ("The immigration judge specifically noted the lack of correspondence from his father and siblings in Honduras, *with whom he is in regular contact*, or testimony from his mother, *with whom he lives*.") (emphasis added); *Yanyun Ni*, 556 F. App'x at 470 ("In her testimony, Ni said she speaks often with her husband in China and also remains in contact with her mother-in-law, with whom her husband and children live."); *Gjoni*, 168 F. App'x at 59 ("Affidavits from Gjoni's immediate family members would not have been difficult for Gjoni to obtain. At the time of the hearing, Gjoni's brothers lived with him in Detroit. Thus, it would have been easy for any one of the three of Gjoni's brothers to be called as a witness."); *Kassem v. Holder*, 438 F. App'x 378, 381 (6th Cir. 2011) ("Kassem could have corroborated the threats against him by obtaining a statement from his wife, with whom he was in regular contact.").

---

[7]The dissent suggests that, under § 1252(b)(4), as a precondition to proving that corroborative evidence is unavailable, an applicant must, without exception, "*try* to obtain corroboration." Dissent Op. at 36. Yet such a requirement is absent from both § 1252(b)(4) and § 1158(b)(1)(B)(ii), and for good reason: It may be abundantly clear—as it is in this case—that securing documentary evidence is impossible, that it does not exist, *see Toure v. Attorney Gen. of U.S.*, 443 F.3d 310, 325 n.8 (3d Cir. 2006), or simply that the evidence is not "reasonably available," without a track record of the applicant carrying out futile attempts to secure it. *See Hor v. Gonzales*, 421 F.3d 497, 500–01 (7th Cir. 2005) (faulting the IJ for ignoring objective country conditions that rendered certain court documents not reasonably available). Our precedent is not to the contrary. It is true that in opinions upholding IJ determinations, we have occasionally noted applicants' apparent failures to attempt to secure certain pieces of corroborative evidence. *See, e.g.*, *Lin*, 565 F.3d at 977 (denying petition of an applicant who "stat[ed] only that he had lost contact with [a potential corroborator]" and did not attempt to locate him). But especially in the immigration context, where "each case is fact dependent," *Adhiyappa v. I.N.S.*, 58 F.3d 261, 267 (6th Cir. 1995), an important or even case-dispositive factor in one scenario may be less significant in another. Indeed, never in a published opinion have we held that "reasonable adjudicator[s] would be compelled" to disagree with the IJ's finding on corroboration only when the applicant puts forth evidence that he attempted to secure the evidence in question. 8 U.S.C. § 1252(b)(4). There have been—and will be—cases in which the lack of a demonstrated attempt to secure corroborative evidence weighs heavily against the applicant, but this is not one of them, as our discussion illustrates. Guzman's credible testimony made clear the unavailability of corroborative evidence from his sister (and mother, as discussed below), even if he did not testify that he attempted to secure it.

Other cases in this circuit involving complications in contact between an applicant and a potential corroborating witness do not present the heightened obstacles evident in this case. For instance, the applicant in *Dorosh v. Ashcroft*, 398 F.3d 379 (6th Cir. 2004), explained that she had not provided corroboration from her mother in part because "her mother had no telephone and had to go to the post office to call her." *Id.* at 383. We upheld the BIA's decision rejecting this explanation because there was no indication that this hindrance had severely affected the applicant's ability to communicate with her mother. Indeed, we noted that "[w]hile contact may not have been convenient, regular, or private, it was sufficient to have allowed Petitioner to obtain a previous letter from her mother in which her mother documented her own mistreatment." *Id.*; *see also Fisenko*, 336 F. App'x at 512 (applicant who "testified [that] he feared for his family" failed to "explain why he feared that they would be harmed for statements made in private communications sent to him"); *Munoz-Cano v. Sessions*, 690 F. App'x 407, 410 (6th Cir. 2017) ("Munoz-Cano submitted a note demanding 600,000 quetzals that his father mailed him but failed to provide a letter from his father explaining how or when the note was received. His father's ability to send the note undercuts Munoz-Cano's explanation for the failure to send a letter."). There is simply no evidence in the record—let alone substantial evidence—that Guzman and his sister were in the type of contact that would make corroboration from her "reasonably available." *Lin*, 565 F.3d at 978. We are therefore compelled to conclude that the IJ's conclusion that Guzman could have received corroborative evidence from his sister because "he was still in contact with [her]" is not supported by substantial evidence. A.R. at 45 (IJ Decision at 4).

With respect to Guzman's mother, the IJ's decision makes no mention of the principal reason offered by Guzman for why he did not provide a letter from her: She is unable to write. *Id.* Nor does the decision make note of Guzman's testimony that (a) his mother, like his stepfather, subjected him to abuse, and that (b) his mother was herself the victim of physical abuse by his stepfather.[8] The IJ simply concluded that "he's in contact with his mother" and

---

[8]The dissent would have us ignore Guzman's credible testimony that his mother both abused him and has suffered abuse at the hands of his stepfather because Guzman has not explicitly linked these facts to his explanation for lacking an affidavit from his mother. Dissent Op. at 38. We reject this impoverished conception of judicial review. *See Nat'l Air Carrier Ass'n v. C. A. B.*, 436 F.2d 185, 195 (D.C. Cir. 1970) ("[W]e point out that judicial review is conducted on the basis of the record as a whole, so that rather conclusory findings can frequently be

faulted Guzman for failing to provide corroboration from her. *Id.* It is true that Guzman testified that he talks to his mother, who still resides in Mexico with Guzman's stepfather, and that he had last spoken to her two weeks prior to the hearing. *Id.* at 127 (Hr'g Tr. at 47). Yet the decisions of the IJ and BIA do not explain how an applicant claiming past abuse can be "reasonably expected," *Abdurakhmanov*, 735 F.3d at 347, to submit an affidavit from a partially illiterate individual who has both suffered and inflicted the same abuse about which the applicant credibly testifies. *See Diallo v. INS*, 232 F.3d 279, 289 (2d Cir. 2000) (rejecting the BIA's conclusion that documentary evidence was "easily accessible" to an applicant, given his "functional illiteracy"). When we have upheld determinations of the IJ and BIA that an individual's illiteracy was not a bar to providing a corroborative affidavit, *see* Dissent Op. at 37 (citing cases), we have relied on the affiant's ability to have their statements transcribed and conveyed to the applicant. For instance, in *Hachem v. Holder*, 656 F.3d 430 (6th Cir. 2011), we noted that the applicant had "admitted that while his mother did not know how to write, others in his mother's household knew how to write and could have provided a statement." *Id.* at 433. There are no such admissions here—to the contrary, there is credible testimony that Guzman's mother still lives with his abusive stepfather. A.R. at 137–38 (Hr'g Tr. at 57–58). Might Guzman have somehow managed to walk his partially illiterate, abused (and abusive) mother through the process of dictating a sworn statement over the phone without her husband finding out? Perhaps. But requiring Guzman to undertake this measure would be plainly excessive. *See Merriam-Webster's Collegiate Dictionary* 1037 (11th ed. 2014) (defining "reasonably" to mean "not extreme or excessive"). There is substantial evidence that an affidavit from Guzman's mother

---

redeemed by resort to a detailed factual record."). Guzman unmistakably presented his claim that the IJ erred in concluding that corroborative evidence from Guzman's mother was reasonably available both to the BIA, A.R. at 20–21 (Resp. Br. at 7–8), and to this court, Pet. Br. at 15, and the record contains especially compelling reasons for Guzman's failure to obtain such corroboration. Just as § 1158(b)(1)(B)(ii) does not require the IJ to make a formal inquiry of why corroborative evidence is unavailable, *see supra* Part III.A., it does not require applicants to offer a formal explanation in order to carry their burden. For example, had Guzman testified credibly that his mother was deceased, but had not expressly stated, "I cannot provide an affidavit from my mother because she is no longer alive," we expect that the dissent would not conclude that such an affidavit was reasonably available. Indeed, the dissent appears to recognize—to a limited extent—the absurdity of requiring the victim of abuse to secure an affidavit from his abuser, *see* Dissent Op. at 38, but suggests that such a requirement would be absurd only when the victim's legal claim itself rests on the abuse of the would-be affiant. This distinction manifestly lacks significance.

was not reasonably available—not the other way around.  We are compelled to conclude that this corroborative evidence was unavailable.[9]

In contrast to the foregoing, Guzman did not explain why he had not submitted affidavits from his aunt or uncle.[10]  There is nothing in the record, however, indicating that these individuals could have corroborated his claim about abuse by his stepfather.  We have noted the significance of failing to provide corroborative evidence from individuals with knowledge of relevant events.  In *Irhibayeva v. Holder*, 549 F. App'x 421 (6th Cir. 2013), we recounted how an applicant's "general credibility was brought into question by failing to offer credible, easily-obtained, corroborating evidence from the neighbor, Stepan, *who was witness to the incident* and with whom [the applicant] claims she still maintains contact."  *Id.* at 427 (emphasis added).  Conversely, we have emphasized the irrelevance of testimony from individuals who lack such knowledge, which the dissent overlooks.  Dissent Op. at 40–41.  In *Urbina-Mejia v. Holder*, 597 F.3d 360 (6th Cir. 2010), we agreed with the applicant that "some of the requested corroboration, specifically letters from his siblings who were likely too young to understand any threats to their much older brother, and testimony from his mother and a letter from his pastor, who were not in Honduras during the relevant time period, are unlikely to be probative with respect to the likelihood of persecution in Honduras."  *Id.* at 368.

Testimony from Guzman's aunt and uncles falls into the latter category.  Based on the evidence available to the IJ, testimony from Guzman's aunt or uncle would not have made his past-persecution claim more or less likely to be true.  The IJ's statement that his aunt or uncle

---

[9]To be clear, we do not conclude that the BIA can make further findings of fact before declaring this evidence unavailable.  We have remanded for further findings of fact when the BIA has not explained (1) why it was reasonable to expect corroboration in a particular case and (2) why an applicant's explanations for lack of corroboration were insufficient.  *See Niang v. Gonzales*, 195 F. App'x 371, 377 (6th Cir. 2006) (citing *Diallo*, 232 F.3d at 290).  Although the IJ and BIA did not expressly acknowledge Guzman's reason for failing to provide corroboration from his mother, they did explain that because he was "in contact" with his mother, it was reasonable to expect corroboration from her.  A.R. at 45 (IJ Decision at 4); *id.* at 5 (BIA Decision at 3).  Given the lack of evidence supporting this conclusion, our remand does not seek further articulation of the IJ's and BIA's rationales.  *See Shah v. Attorney Gen. of U.S.*, 273 F. App'x 176, 180 (3d Cir. 2008) (declining to remand for further discussion of an applicant's excuse for lack of corroboration, when the BIA's refusal to accept this excuse was erroneous "no matter what the BIA's actual rationale").

[10]Guzman testified that he had multiple uncles, but the IJ's decision does not clarify which uncle it is discussing.  We consider herein references to both uncles.

could have provided corroboration glosses over Guzman's testimony that when he was one year old, he and his mother moved from Estanzuela Grande, where the Guzman-Vazquez family was located, to a new town six hours away. *See* A.R. 110 (Hr'g Tr. at 30) ("[M]y family take me away from—my mother take me away from that town to a different town, but—about six hours away so she can . . . for we can survive because they were telling those people that I was next."); *id.* at 116 ("My mother take me out of that town when I was one year old."). His two uncles thereafter apparently retained possession of the family farm in Estanzuela Grande. *Id.* at 112. One uncle subsequently fled Mexico to escape the violence to which the family was subjected; the other remains in Estanzuela Grande to this day—far from where Guzman suffered abuse at the hands of his stepfather. *Id.* at 112–14 (A: "On my father's side I got two [uncles]." Q: "Where is the other uncle?" A: "He's in United States." Q: "Do you know why he came to the United States?" A: "Same reason, he not want to get killed." Q: "Okay. So the other uncle is still in the town, I think you testified that." A: "Yes. . . . Yes, this is the one he's living in the town."). In other words, neither of them left Estanzuela Grande for San Pedro Mixtepec along with Guzman and his mother. Similarly, the aunt of whom the IJ spoke as another potential corroborator lived "about an hour away from where [Guzman's] dad used to live" in Estanzuela Grande—again, far from where Guzman lived in San Pedro Mixtepec with his stepfather. *Id.* at 124. There is thus no evidence in the record that these family members lived in San Pedro Mixtepec or had any awareness of the abuse to which Guzman was subjected by his stepfather.

Without question, substantial evidence supported a determination that the uncles and aunt could have offered probative statements about external threats of violence facing members of Guzman's biological family. For example, when asked how he knew that another family had killed both his father and grandfather, Guzman responded, "Because my aunt told me." *Id.* at 148. The IJ sensibly pointed to these individuals as knowledgeable of the violence that the Guzman-Vazquez family faced from another family in Estanzuela Grande. *Id.* at 44 (IJ Decision at 3). But the only probative evidence in the record situates them far from San Pedro Mixtepec, where Guzman suffered child abuse, which is the only claim that we consider in this petition for review; these relatives were undisputedly "not in [San Pedro Mixtepec] during the relevant time

period." *Urbina-Mejia*, 597 F.3d at 368.[11] For these reasons, the IJ's determination that the aunt's and uncles' testimony would have "corroborate[d] otherwise credible testimony" was not supported by substantial evidence. 8 U.S.C. § 1229a(c)(4)(B).

The IJ faulted Guzman for his failure to submit evidence from "all the people that could provide corroboration," A.R. at 45 (IJ Decision at 4), yet exhaustive review of the record does not reveal any other individuals, apart from those discussed above, whose probative testimony was "reasonably available," either in written or oral form. For this reason, we disagree with the IJ's further conclusion that corroboration of Guzman's claim that his stepfather had a relationship with the police or town management was available. As discussed, letters from Guzman's sister and mother were not reasonably available, and there is no evidence in the administrative record of other individuals who might have conveyed the relevant documentation of such a relationship to Guzman. Again, we do not question the IJ's finding that such corroboration was important to verify the recollections of an individual who left home at 14 years old. But an applicant is not required to provide corroborative evidence when he "does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). The IJ's and BIA's conclusion that this evidence was reasonably obtainable was not "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mikhailevitch*, 146 F.3d at 388 (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4))).

---

[11]The dissent conflates corroboration with credibility in arguing that "[l]etters from Guzman's aunt or uncles confirming that his father had been murdered and that he had moved with his mother to the small town where his stepfather lived would increase the likelihood that he was telling the truth about the abuse too." Dissent Op. at 41. With respect to a "credibility determination," the REAL ID Act allows the IJ to consider "any inaccuracies or falsehoods in [an applicant's] statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). But this component of the statute is irrelevant here, because the IJ explicitly found Guzman to be credible, *see* A.R. at 43 (IJ Decision at 2), and neither the IJ nor the BIA ruled against Guzman on this claim based on his failure to produce corroborative evidence that his father had been murdered or that he had moved to San Pedro Mixtepec. "[T]he Board's denial of relief may be affirmed only on the basis articulated in the decision and this Court may not assume that the Board considered factors that it failed to mention in its opinion." *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004). The dissent's approach contravenes this rule.

**C. Nexus**

Having concluded that the IJ and BIA erred in analyzing the availability of corroborative evidence, we next address whether the agency erred in rejecting Guzman's claim that he was persecuted "because of" his membership in the particular social group that the IJ found cognizable. The IJ's holding was clear: "To put it quite simply, the Court does not find that this step-father abused [Guzman] because he was the child of his biological mother and father or that he was the child of just his father." A.R. at 50 (IJ Decision at 9). In affirming this determination, the BIA relied on its precedent in *Matter of C-T-L-*, 25 I. & N. Dec. 341 (2010), explaining that for withholding cases as well as asylum cases, "a protected ground [must] be at least one central reason for the alleged persecution in order to establish the requisite nexus." A.R. at 6 n.3 (BIA Decision at 4). In his petition for review, Guzman argues that the BIA applied the wrong standard to his claim, because "the withholding statute requires only that his membership in the particular social groups the IJ recognized [be] 'a reason'—not 'one central reason' for the persecution he suffered at the hands of his step-father." Pet. Br. at 12.

This dispute arises from changes made to the INA by the REAL ID Act. Prior to the enactment of the REAL ID Act, the INA did not specify whether and how an applicant could be granted relief from deportation—either through asylum or withholding of removal—if the applicant was persecuted because of both protected and unprotected grounds, or in other words, because of mixed motives. The REAL ID Act clarified that, with respect to asylum claims, "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). The Act did not, however, establish a similar standard for withholding claims. Instead, the withholding statute reads:

> In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for *a reason* described in subparagraph (A) [race, religion, political opinion, etc.], the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 1158(b)(1)(B) of this title.

8 U.S.C. § 1231(b)(3)(C) (emphasis added).

After the REAL ID Act's enactment, the BIA subsequently held that the "one central reason" test for asylum claims applies to withholding claims, too. *Matter of C-T-L-*, 25 I. & N. Dec. 341 (BIA 2010). It reasoned that (1) although the withholding statute is silent on this point, language in the asylum and withholding statutes is otherwise similar, so "adopting two different standards would be unharmonious and asymmetrical," *id.* at 347; (2) Congress intended to provide a uniform standard for assessing motivation, both across circuits and types of claims for relief, *id.* at 345–46; (3) prior to the REAL ID Act, the BIA had applied the nexus requirement to asylum and withholding cases identically, and there was "no indication that Congress intended to change this approach," *id.* at 346; (4) applying different standards would, as a practical matter, "make these adjudications more complex, unclear, and uncertain," *id.* at 347; and (5) even if there were no clear congressional intent, the BIA's application of the "one central reason" standard represented a "reasonable choice within a gap left open by Congress," *id.* at 348 (quoting *Chevron, U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)).

Since *Matter of C-T-L-* was decided, two circuits have considered this issue in published opinions, and have come to opposite conclusions.[12] In *Gonzalez-Posadas v. Attorney Gen. U.S.*, 781 F.3d 677 (3d Cir. 2015), the Third Circuit briefly stated in a footnote that *Matter of C-T-L-* had correctly assessed "Congress's intent to eliminate the confusion and disparity inherent in the 'mixed motive' persecution tests in the context of both claims for asylum and claims for withholding of removal." *Id.* at 685 n.6 (quoting *Matter of C-T-L-*, 25 I. & N. Dec. at 348).[13]

---

[12]We have not opined on this issue. In the unpublished Sixth Circuit cases cited by the government, we stated—without any discussion—that an applicant for withholding of removal must demonstrate that a protected ground was "at least one central reason" for the claimed persecution. *See Torres-Vaquerano v. Holder*, 529 F. App'x 444, 447 (6th Cir. 2013); *Agustin-Tomas v. Sessions*, 728 F. App'x 590, 594 (6th Cir. 2018). We did not opine on the nexus issue presented in this case for good reason: In neither *Torres-Vaquerano* nor *Agustin-Tomas* did the parties dispute the applicability of the "at least one central reason" test to withholding claims. *See generally* Petitioner's Brief, *Torres-Vaquerano v. Holder*, 529 F. App'x 444 (6th Cir. 2013) (No. 12-3355); Brief for Respondent, *Torres-Vaquerano*, 529 F. App'x 444; Brief of Petitioner, *Agustin-Tomas v. Sessions*, 728 F. App'x 590 (6th Cir. 2018) (No. 17-3884); Respondent's Answering Brief, *Agustin-Tomas*, 728 F. App'x 590. Furthermore, these unpublished decisions are non-precedential. *See* 6th Cir. R. 32.1(b).

[13]The Third Circuit noted that "the parties appear[ed] to agree on this point." *Gonzalez-Posadas*, 781 F.3d at 685 n.6.

In *Barajas-Romero v. Lynch*, 846 F.3d 351 (9th Cir. 2017), by contrast, the Ninth Circuit explained in a lengthy opinion why *Matter of C-T-L-* was incorrectly decided. First, Congress did not ignore the withholding statute when it enacted the REAL ID Act—in fact, it amended it to clarify that clauses (ii) and (iii) of the asylum statute's burden-of-proof provision—but, critically, *not* clause (i), which includes the "one central reason" test—would be applied to withholding claims. *Id.* at 358–59 ("Congress's express incorporation of two of the three asylum burden-of-proof provisions into the withholding of removal statute, but not the provision including the 'one central reason' language, indicates that Congress did not intend for the 'one central reason' standard to apply to withholding of removal claims."). Second, because "'a reason' includes weaker motives than 'one central reason,'" the statutes must mean different things. *Id.* at 359. For these reasons, *Matter of C-T-L-* "starts with a false premise that Congress was 'silent.' It was not. It explicitly said 'at least one central reason' for asylum, and 'a reason,' an expressly different standard, for withholding." *Id.* With respect to the BIA's call for *Chevron* deference, the Ninth Circuit explained that "there is no ambiguity justifying deference to the administrative agency's contrary view." *Id.* at 360.

We agree with the Ninth Circuit's reasoning in *Barajas-Romero*. The court's explanation of why the statutory text is unambiguous accounts for the government's various arguments in this case about statutory interpretation, practical considerations, and legislative intent. We need look no further than the text of the withholding statute in comparison with the text of the asylum statute: "a reason" is different from—and weaker than—"a central reason." We are thus not "left only with the plain meaning of 'because of,'" Dissent Op. at 50, or "for," *id.* at 49, which the dissent concludes is "but-for," despite enumerating the myriad contexts in which courts have decided it means something else; rather we are left with the plain meaning of "for a reason" in the withholding statute in comparison with "at least one central reason" in the asylum statute. Accordingly, we interpret a statute that, unlike its statutorily-linked neighbor in § 1158(b)(1)(B), mentions only "a reason," not "at least one central reason." And as the Ninth Circuit explained, Congress was clearly aware of the possibility of applying the asylum statute's three burden-of-proof provisions to the withholding statute. Indeed, it did this for two out of the three provisions, but not for the one provision that we consider here.

To the Ninth Circuit's reasoning we add a brief response to the government's argument that in *Barajas-Romero*, the court "overlooked the most natural explanation for the omission of a cross-reference to the 'one central reason' provision of the asylum statute: That provision requires the applicant to establish that he is a 'refugee,' 8 U.S.C. § 1158(b)(1)(B)(i), a requirement that is inapplicable to a withholding claim." Resp. Br. at 29. The BIA made a similar point in *Matter of C-T-L-*, stating that it would have been nonsensical for Congress to link the "one central reason" provision of the asylum statute to the withholding statute, because that provision "refers to the definition of a 'refugee' in section 101(a)(42)(A) that an applicant must meet, which is a lesser burden than that required for withholding of removal." 25 I. & N. Dec. at 347. The government and the BIA are correct that "refugee" is a term of art linked specifically to the asylum statute, not to the withholding statute. *See* 8 U.S.C. § 1231(b)(3)(A) (withholding of removal) ("Notwithstanding paragraphs (1) and (2), the Attorney General may not remove *an alien* to a country if the Attorney General decides that *the alien's* life or freedom would be threatened in that country because of the *alien's* race, religion, nationality, membership in a particular social group, or political opinion") (emphasis added).

Yet this argument ignores that Congress *has* linked the withholding statute to another provision of the asylum statute that uses the term "refugee." Section 1231(b)(3)(C) of the withholding statute reads:

> In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in *clauses (ii)* and (iii) of section 1158(b)(1)(B) [the asylum statute].

*Id.* (emphasis added). Section 1158(b)(1)(B)(ii) of the asylum statute, in turn, reads in relevant part: "The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a *refugee*." 8 U.S.C. § 1158(b)(1)(B)(ii). But based on the government's and the BIA's logic, neither clause (i) or (ii) of § 1158(b)(1)(B) should relate to withholding claims, because both refer to proof "that the applicant is a refugee." However, we know from Congress's linking of

the withholding statute in § 1231(b)(3)(C) to subsection § 1158(b)(1)(B)(ii)—which requires proof that the applicant is a refugee—that Congress had no qualms with making burden-of-proof rules in the asylum statute applicable to the withholding statute. The decision not to incorporate the asylum statute's "one central reason" test thus appears, once again, not to have been the product of "mere drafting oversight." *Barajas-Romero*, 846 F.3d at 358.

The dissent's professed adherence to the "plain text" of the statute, Dissent Op. at 51, fits poorly with its decision to "choose" an interpretation that is found nowhere in the text. *Id.* at 47. It begins by setting up "two poles" between which all mixed-motives analyses must fit, *id.* at 46–47, even though one of these poles—requiring the statutorily covered motive to be "the *sole* motive for a defendant's action," *id.* at 46—has no relevance to immigration law. *See Parussimova v. Mukasey*, 555 F.3d 734, 740 (9th Cir. 2009) (clarifying that even under the asylum burden-of-proof standard, "an asylum applicant need not prove that a protected ground was *the only* central reason for the persecution she suffered") (emphasis added). This allows the dissent to call the "but for" standard on which it settles as a "middle option," Dissent Op. at 47, when in fact its chosen standard would be stricter than the "at least one central reason" test applicable to asylum cases, despite Congress's addition of a more stringent mixed-motive test for asylum claims than for withholding claims. *Parussimova*, 555 F.3d at 740.

No matter, says the dissent. This would "respect[] the traditional understanding that withholding-of-removal claims will fail when asylum claims fail." Dissent Op. at 51. Apart from ignoring the comparatively weaker mixed-motive test that Congress established for withholding claims in § 1231(b)(3)(C), as discussed above, this reasoning ignores the crucial context in which we have stated that withholding imposes a "higher burden" than asylum. Take *Singh v. Ashcroft*, 398 F.3d 396 (6th Cir. 2005), which the dissent cites for its "higher burden" observation. Dissent Op. at 50. When we made this observation in *Singh*, it immediately followed our specific comparison of the likelihood of persecution between the asylum and withholding statutes. Specifically, we explained:

> The Attorney General, in his or her discretion, may grant asylum to a "refugee;" i.e., "a person who is unable or unwilling to return to his home country 'because of persecution or a *well-founded fear* of persecution on account of race,

religion, nationality, membership in a particular social group, or political opinion.'"

. . .

An alien seeking withholding of removal must demonstrate "that there is *a clear probability* that he will be subject to persecution if forced to return to the country of removal."

*Singh*, 398 F.3d at 401 (citations omitted) (emphasis added). Because "well-founded fear" is lower than "clear probability," "an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility," meaning that, with respect to likelihood of persecution, "an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal." *Id.* Our observation in *Singh* that withholding poses a "higher burden" than asylum related only to the former's steeper requirement of more-likely-than-not persecution. The dissent points to no published decision of this court that has regarded asylum denial on the basis of an applicant failing the "one central reason" test as foreclosing a withholding claim. Our decision, according to the dissent, "mak[es] causation for [withholding] claims easier to prove than causation for asylum claims," Dissent Op. at 31, but such a general claim overlooks the narrow consequence of today's holding, which clearly leaves untouched the more difficult burden facing a withholding applicant on the question of likelihood of persecution.

For the foregoing reasons, we hold that applicants for withholding of removal under 8 U.S.C. § 1231(b)(3) must demonstrate that a protected ground was at least one reason for their persecution, and we remand to the BIA to decide the case under the correct standard.[14]

## D. Change in Circumstances

The IJ alternatively found that even if Guzman had successfully proven his past-persecution claim, a fundamental change in circumstances—namely, the lack of dependency Guzman now has on his stepfather for sustenance—rendered his claim moot. A fundamental

---

[14]We note furthermore that no evidence in the record suggests that Guzman's stepfather was motivated by "crime." A.R. at 50 (IJ Decision at 9). The repeated references to Guzman's "fear of criminality" are therefore misplaced, *id.*, and the BIA should address these errors in the IJ's decision on remand.

change in circumstances can indeed render viable past-persecution claims nonviable. As we have explained:

> If the applicant establishes that he has suffered past persecution, the government may rebut the presumption of a well-founded fear of future persecution by showing by a preponderance of the evidence either that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds" or that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal."

*Vincent v. Holder*, 632 F.3d 351, 355 (6th Cir. 2011) (alterations in original) (quoting 8 C.F.R. § 1208.16(b)(1)(i)(A)-(B)).

Given that the BIA did not address this alternative rationale for denying Guzman relief, we decline to review it, pursuant to *INS v. Orlando Ventura*, 537 U.S. 12 (2002). In *Orlando Ventura*, the immigration judge had denied an applicant relief because he failed to demonstrate a nexus to a protected ground. The IJ added in her decision that country conditions had changed so significantly that the applicant's claim of persecution was not viable. The BIA agreed with the IJ on the nexus issue, but did not address the IJ's alternative holding. On petition for review, after rejecting the BIA's conclusion on the nexus issue, the Ninth Circuit Court of Appeals held that even though the BIA had not decided the changed-circumstances question, the court would not remand for a decision on this issue because the record evidence demonstrated that circumstances in the applicant's country had not, in fact, changed. The Supreme Court reversed the Ninth Circuit, explaining in part:

> Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands. This principle has obvious importance in the immigration context. The BIA has not yet considered the "changed circumstances" issue. And every consideration that classically supports the law's ordinary remand requirement does so here.

*Id.* at 16–17. The posture of the instant case is nearly identical: The IJ denied Guzman relief based in part on the nexus issue, and alternatively held that a fundamental change in circumstances rendered his past-persecution claim moot. The BIA did not opine on the change-in-circumstances question. If the facts regarding changed circumstances were undisputed—for example, if both Guzman's mother and stepfather had died—then perhaps we could resolve this

case without remanding to the BIA. But this is not the case. *See* A.R. 140 (Hr'g Tr. at 60) (Q: "And you haven't spoken to him since you left?" A: "Yeah . . . . He's still looking for me."); *id.* at 144 ("I return to Mexico I would say he probably kill me, because he had too much hate."). In line with *Orlando Ventura*, "it is for the BIA to address th[is] matter[] in the first instance." *Torres-Vaquerano v. Holder*, 529 F. App'x 444, 449 (6th Cir. 2013).

## IV. CONCLUSION

For the foregoing reasons, we **GRANT** the petition for review, **VACATE** the BIA's decision, and **REMAND** for further proceedings consistent with this opinion.

—————————

**DISSENT**

—————————

MURPHY, J., dissenting.  Respectfully, the majority can grant Manuel Guzman-Vazquez relief only by making three mistakes and deepening two circuit conflicts.  *First*, the majority shrinks the wide latitude Congress gave the Board of Immigration Appeals to require immigrants to corroborate their testimony.  By doing so, my colleagues resuscitate the rigorous review of the Board's corroboration decisions that Congress sought to end with the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302.  Before that Act the Ninth Circuit regularly rejected the Board's requirement that immigrants corroborate testimony.  *Ladha v. INS*, 215 F.3d 889, 899–901 (9th Cir. 2000).  In response, Congress broadly permitted immigration judges to require "evidence that corroborates otherwise credible testimony" unless immigrants prove that they do "not have the evidence and cannot reasonably obtain" it.  8 U.S.C. § 1158(b)(1)(B)(ii).  To stop judicial interference with this new discretion, Congress barred courts from reversing corroboration decisions unless any "reasonable" person would be "compelled to conclude that corroborating evidence is unavailable."  *Id.* § 1252(b)(4).  Here, Guzman testified that he spoke to his mother a mere two weeks before his hearing and regularly texts with his aunt.  Yet he did not even try to get a letter from them (or others) over the three-plus years his immigration proceedings progressed.  How can this record *compel* the conclusion that no evidence from relatives was available?

*Second*, to overturn the Board's corroboration decision, my colleagues add to a circuit split by adopting a new legal rule: At hearings, immigration judges must identify each fact that needs corroboration so that immigrants may address the availability of any corroborating evidence for that fact.  Caselaw from the Ninth and Third Circuits might support this rule.  Those courts hold that immigration judges must give immigrants notice that they will need to corroborate facts and "a sufficient opportunity to obtain the evidence or explain [their] failure to do so."  *Ren v. Holder*, 648 F.3d 1079, 1093 (9th Cir. 2011).  But our caselaw does not.  We (and four other courts) hold that federal law does not entitle immigrants "to notice from the Immigration Court as to what sort of evidence" the immigrant must provide.  *Gaye v. Lynch*,

788 F.3d 519, 530 (6th Cir. 2015); *e.g.*, *Avelar-Oliva v. Barr*, 954 F.3d 757, 769–71 (5th Cir. 2020). The majority's new rule conflicts with *Gaye*'s reading of the statutory text and structure. As the Second Circuit has reasoned, an immigration judge might "not determine that corroboration is necessary" until after a hearing when "weigh[ing] the evidence and prepar[ing] an opinion." *Liu v. Holder*, 575 F.3d 193, 198 (2d Cir. 2009). We thus should not require the judge to identify "the points of testimony that require corroboration" before that time. *Id.*

*Third*, my colleagues adopt the Ninth Circuit's causation test for withholding-of-removal claims, making causation for those claims easier to prove than causation for asylum claims. *See Barajas-Romero v. Lynch*, 846 F.3d 351, 356–60 (9th Cir. 2017). Yet we have held for decades that an immigrant "who fails to qualify for asylum *necessarily* does not qualify for withholding of removal." *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (emphasis added). We can no longer make that statement. The withholding-of-removal statute requires Guzman to prove that his "life or freedom would be threatened" "because of" one of several reasons, such as race, religion, or membership in a particular social group. 8 U.S.C. § 1231(b)(3)(A). The asylum statute requires an immigrant to prove that one of these reasons was "at least one central reason" for a persecutor's harm. *Id.* § 1158(b)(1)(B)(i). Because the withholding-of-removal statute lacks this language, the majority holds, it requires immigrants to show only that a statutory reason was "a reason" for threatened harm and permits relief even if that harm would still occur for a different reason. Yet the plain text requires threats to arise "because of" a statutory reason. *Id.* § 1231(b)(3)(A). The Supreme Court and this court have repeatedly held that "because of" adopts at least but-for causation. *United States v. Miller*, 767 F.3d 585, 591–92 (6th Cir. 2014). I thus would hold that an immigrant must prove that a statutory reason "was a but-for reason" of the threatened harm. *Id.* at 591.

For these three general reasons, I respectfully dissent.

## I

At his immigration hearing Guzman testified about his childhood in Mexico but offered no evidence from relatives. He stated that he was born in a small town, but that unknown individuals murdered his father when he was a year old. Admin. Rec. 109–10, 114–17 ("AR").

His father's brothers (Guzman's uncles) took over his father's property. One uncle still lives there and the other now lives in New Jersey. AR 110–13. Soon after his father's murder, Guzman moved with his mother and sister to another small town six hours away. AR 110, 116, 121. At some point his mother married his stepfather. When Guzman was still a small child, his stepfather began to beat or whip him every other week. AR 106, 128, 140. Guzman's stepfather abused him because he hated him and got upset when Guzman did not finish chores quick enough. AR 140, 145. His stepfather also hit his sister, and hit his mother when she tried to stop the abuse. AR 107, 128, 140. Yet Guzman said his mother also abused him for the same reason: His stepfather and mother forced him to do everything and "[i]f something [was] not there in the house when they look for it, it's on me." AR 147–48. Guzman recalled that his stepfather had a good relationship with the police because he had an official town position, so no one reported this abuse. AR 108–09. Guzman also never received medical care for his injuries. AR 141. When he was 14, he left home. AR 106. His aunt (his father's sister) eventually helped him come to the United States. *Id.* He entered this country in 1998 when he was 17. AR 105, 121–22.

Since living in the United States, Guzman has been arrested four times. AR 131–32, 192. Most recently, he agreed to a deferred adjudication for assaulting the mother of his children. That criminal case triggered these removal proceedings. AR 132. Guzman sought withholding of removal, asserting that he would face harm in Mexico from his father's murderers and from his stepfather. AR 42–43, 127–28, 143–44. Guzman, now 38, believes his stepfather would be about 70 today. AR 50–51, 127, 138, 168. Yet Guzman said his stepfather still has an official town role and still hates him. AR 129, 145.

An immigration judge rejected Guzman's claim on an evidentiary ground and a substantive ground. As for the evidentiary ground, the judge held that Guzman's testimony was "not sufficient to sustain his burden of proof without corroboration" from relatives. AR 43. The judge explained that Guzman's claim about his stepfather was "easily subject to verification" from his mother, sister, aunt, or uncle, and that he should have at least corroborated his stepfather's existence. AR 45–46. As for the substantive ground, the judge held that Guzman could not establish withholding of removal's causation element for the same reasons he could not

show asylum's causation element. AR 55. Guzman said he belonged to "particular social groups" defined as relatives of his father or children of his parents. AR 51–52. But Guzman did not show that his stepfather "abused him because he was the child of his biological mother and father." AR 50.

The Board agreed. On the evidentiary ruling, it noted that Guzman presented "insufficient corroboration that the stepfather exists" and did not adequately explain why he could not get evidence from "such people as his aunt, sister, or mother." AR 5. On the substantive ruling, the Board rejected Guzman's argument that the causation element for withholding of removal is easier to meet than the causation element for asylum, which asks whether a statutorily covered reason was a "central reason" for persecution. While Guzman relied on a Ninth Circuit case for this argument, the Board recognized that our court has not adopted its view. Guzman also did not show that his relationship to his parents was "a central reason" for his stepfather's abuse. AR 5–6.

## II

The withholding-of-removal statute provides: "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The majority holds that no reasonable person could think that Guzman should have corroborated his claim; that Guzman was wrongly not given an opportunity to explain why he did not corroborate certain facts; and that the statute sets a lenient causation test. I disagree on all three fronts.

## A

1. Before delving into Guzman's facts, I think it worth recalling Congress's instructions on corroborating evidence. In the REAL ID Act of 2005, Congress imposed a doubly daunting task on immigrants who seek to overturn the Board's conclusion that they should have corroborated their testimony. Pub. L. No. 109-13, 119 Stat. 302, 303–05. The Act's evidentiary standards give immigration judges broad discretion to require corroboration, and its review standards compel courts to give great deference to those conclusions.

Start with the evidentiary standards. The REAL ID Act confirmed that the withholding-of-removal statute places the burden of proof on immigrants. "An alien applying for relief or protection from removal has the burden of proof to establish that the alien" "satisfies the applicable eligibility requirements[.]" 8 U.S.C. § 1229a(c)(4)(A)(i). Subparagraph (A) of the withholding-of-removal statute identifies those requirements (threats to life or freedom because of a protected ground). *Id.* § 1231(b)(3)(A). The REAL ID Act next added subparagraph (C), which incorporates new credibility and corroboration procedural rules from the asylum statute (§ 1158): "In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of [8 U.S.C. §] 1158(b)(1)(B)." *Id.* § 1231(b)(3)(C).

As relevant here, the asylum statute's new corroboration rule allows immigration judges to excuse an immigrant's failure to obtain corroborating evidence in certain circumstances, but gives those judges broad discretion to reject uncorroborated claims:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

*Id.* § 1158(b)(1)(B)(ii); *id.* § 1229a(c)(4)(B). This rule's last sentence shows that an immigrant "must" provide corroborating evidence if the "trier of fact determines that the applicant should" do so. *Id.* § 1158(b)(1)(B)(ii). The word "must" imposes a command, not an option; immigrants are "obliged or required" to provide this evidence. *American Heritage Dictionary of the English Language* 1160 (4th ed. 2000); *Merriam-Webster's Collegiate Dictionary* 819 (11th ed. 2014). And this duty extends to any evidence that could "strengthen or confirm" an immigrant's claim. *Black's Law Dictionary* 421 (10th ed. 2009) (defining "corroborate"). It also applies even if an immigrant provides "otherwise credible testimony." 8 U.S.C. § 1158(b)(1)(B)(ii).

The "statutory history" confirms that the REAL ID Act gives immigration judges wide latitude. *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1071–72 (2020); Antonin Scalia & Bryan A. Garner, *Reading Law* 256 (2012). Before the Act, the Board had long held that "the provision of corroborating evidence is not optional, and [immigrants] must satisfy their affirmative duty to corroborate their claim to the degree that they can, or otherwise reasonably explain their failure to do so." *In re B-B-*, 22 I. & N. Dec. 309, 311 (BIA 1998). The Board applied this rule not just to evidence of general country conditions, *In re S-M-J-*, 21 I. & N. Dec. 722, 724 (BIA 1997) (en banc), but also to evidence of an immigrant's specific claims, *In re M-D-*, 21 I. & N. Dec. 1180, 1182–83 (BIA 1998) (en banc), *vacated on other grounds by Diallo v. INS*, 232 F.3d 279 (2d Cir. 2000). And the rule applied even if an immigrant testified credibly. *S-M-J-*, 21 I. & N. Dec. at 731. Why would Congress feel the need to codify these procedures? The Ninth Circuit's caselaw. That court had broadly rejected the Board's corroboration requirements. *See Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (discussing *Ladha v. INS*, 215 F.3d 889 (9th Cir. 2000)). By placing these corroboration rules in the statute, courts could no longer refuse to follow them.

That said, the REAL ID Act codified the Board's prior safety valve. Before the Act, the Board had found that immigrants need not corroborate testimony that is "not reasonably subject to verification." *S-M-J-*, 21 I. & N. Dec. at 725. The Act thus added that immigrants need not present evidence if they do "not have the evidence and cannot reasonably obtain" it. 8 U.S.C. § 1158(b)(1)(B)(ii). The adverb "reasonably" signals that immigrants need not take "extreme or excessive" measures. *Merriam-Webster's Collegiate Dictionary*, *supra*, at 1037. But what qualifies as "excessive"? Reasonable is, after all, a "protean word[]" whose meaning depends on context. *Vrljicak v. Holder*, 700 F.3d 1060, 1062 (7th Cir. 2012). In this context I would look to the Board's prior "administrative interpretation" for what Congress had in mind when choosing this word. Scalia & Garner, *supra*, at 323–24. The Board had held that immigrants must "explain [the] unavailability" of corroborating evidence. *S-M-J-*, 21 I. & N. Dec. at 724. And it expected them to take fairly significant efforts to obtain it. In *Dorosh*, for example, an immigrant claimed that she had not obtained corroboration from her mother because "her letters did not reach her mother, her mother had no telephone and had to go [to] the post office to call her, and any attempts to talk about [her] asylum case or obtain affidavits from others would have

jeopardized her mother's safety." 398 F.3d at 383. Yet we upheld the Board's finding that the immigrant "could be 'reasonably expected'" to obtain evidence from her mother. *Id.*

The REAL ID Act lastly altered our own review. To ensure that courts would not undercut the Board's new statutory discretion, Congress added a standard of review specifically tailored to this issue. 119 Stat. at 305. The provision says: "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the court finds, pursuant to subsection (b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4). The Board's corroboration finding is thus "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* § 1252(b)(4)(B); *see Hachem v. Holder*, 656 F.3d 430, 435 (6th Cir. 2011).

2. Applying this law, I would uphold the Board's order. I begin with a big-picture reason. Guzman bore the burden to prove that no corroborating evidence was available. *See Urbina-Mejia v. Holder*, 597 F.3d 360, 367 (6th Cir. 2010). Yet he did not even try to gather that evidence. As we have held, a reasonable adjudicator can conclude that immigrants have not met their burden if they do not even *try* to obtain corroboration. *See Qiao Zhen Jiang v. Holder*, 341 F. App'x 126, 128 (6th Cir. 2009); *Jacobs v. Holder*, 337 F. App'x 458, 463 (6th Cir. 2009); *Shkabari v. Gonzales*, 427 F.3d 324, 331 (6th Cir. 2005). Before the REAL ID Act, for example, we upheld the Board's rejection of an immigrant's claim that she could not find her medical records when she "did not present any evidence in the forms of letters or envelopes" showing she attempted to do so over a span of "several months." *Shkabari*, 427 F.3d at 331.

My colleagues respond that immigrants need not try to get corroboration when it is obvious that such evidence does not exist or would be impossible to obtain. Majority Op. 16 n.7. If, for example, Guzman had testified that his relatives had all passed away, no reasonable person would expect him to "try" to get a letter from them. *Id.* at 17 n.8. True enough. But Guzman's mother, sister, aunt, and uncles are alive and he conceded that he could have tried to provide corroboration from at least one of them. More than three-and-a-half years passed between Guzman's first appearance and his merits hearing. AR 76, 95. He was represented by counsel

almost that entire time. AR 83–84. He spoke with some of these relatives on a regular basis. Yet the record does not show that he took a single step to obtain a letter from any of them. *E.g.*, AR 113, 125, 142–43. His lack of diligence alone should compel us to uphold the Board's order.

Turn to a relative-by-relative analysis. The majority says that evidence from Guzman's mother or sister was "corroborating" but not "reasonably available," and that evidence from his aunt or uncles was "reasonably available" but not "corroborating." Its analysis shrinks the Board's broad discretion and enlarges the court's narrow review, in violation of the REAL ID Act.

*Guzman's Mother*. A reasonable adjudicator could think that Guzman should have presented evidence from his mother, who lives in the same town with his stepfather. AR 137–38. She knew of his stepfather's abuse and suffered abuse of her own. AR 107. Guzman still talks to her and, indeed, spoke with her two weeks before his hearing. AR 127. Yet his mother did not provide so much as a letter to support him. When asked if he could get evidence from her, Guzman responded: "I can try, getting a letter from her." AR 142. So he never even tried.

Why, despite Guzman's statement that he could try to get a letter from his mother, would any reasonable judge be forced to conclude that this evidence was unavailable? The majority asserts it is because Guzman's mother cannot write. I must disagree on the facts and the law. Factually, Guzman did not identify his mother's illiteracy as a reason why he could not *obtain* a letter. AR 142–43. He listed it as the reason why he did not *ask* for one. When questioned how he might get a letter, he said that his mother "probably [would] have to talk to someone up there to write it for her." AR 143. Guzman thus conceded that corroboration might be available. Legally, we have made the same point—three times, no less—when rejecting illiteracy as an excuse. A relative's illiteracy "would not have prevented [the relative] from telling someone else, even [the immigrant's] lawyer, what had happened and from capturing that interview on a tape or in a written affidavit." *Sy v. Holder*, 316 F. App'x 408, 410 (6th Cir. 2009) (per curiam); *Hachem*, 656 F.3d at 433–35; *Kassem v. Holder*, 438 F. App'x 378, 379–81 (6th Cir. 2011). Others agree. *See Dorje v. Lynch*, 637 F. App'x 631, 633 (2d Cir. 2016) (order); *cf. Singh v. Att'y Gen. of U.S.*, 216 F. App'x 242, 246 (3d Cir. 2007). I would not treat Guzman, our court,

and our sister circuits as unreasonable in thinking that someone might be able to transcribe a letter for a relative.

The majority bolsters its claim that a letter from Guzman's mother was unavailable with a reason that Guzman himself does not raise: that his mother abused him. Whatever the merits of this argument, we cannot consider it. Under 8 U.S.C. § 1252(d)(1), we may review "only those claims 'properly presented to the [Board] and considered on their merits.'" *Tomaszczuk v. Whitaker*, 909 F.3d 159, 167 (6th Cir. 2018) (citation omitted); *Gazeli v. Sessions*, 856 F.3d 1101, 1106–07 (6th Cir. 2017). Guzman's brief to the Board nowhere even mentioned his mother's abuse. AR 17. What is more, Guzman does not even raise this argument now. His brief identifies only his mother's illiteracy and the claim that she has "forsaken" him as the reasons why he did not obtain a letter from her. Pet. Br. 16. So even if Guzman had exhausted this issue, he forfeited it in our court. *See Welson v. Sessions*, 744 F. App'x 249, 259 n.8 (6th Cir. 2018).

In all events, Guzman's cursory testimony about his mother's abuse did not compel the Board to conclude that evidence from her was unavailable. I might agree that, if Guzman were relying on his mother's persecution for his claim, the Board should not expect her to concede she abused her son. *Cf. S-M-J-*, 21 I. & N. Dec. at 725. But Guzman does not do so. For good reason. Unlike his relatively detailed testimony about his stepfather, Guzman testified only that his mother did the "same thing my step-dad did," that he was the child who had to "do everything," and that if "something [was] not there in the house when they look for it, it's on" him. AR 147–48. As the Board noted, Guzman's mother at least could have confirmed such mundane (yet critical) matters as whether his "stepfather exists" and "is married to" her. AR 5. Guzman also conceded that he still talks to his mother and that "[a]t one point" she told him that she wanted him to return to Mexico to see her because she had not seen him for a long time. AR 144. Those are not the words of someone unwilling to help. At least the Board could reasonably so conclude.

*Guzman's Sister*. A reasonable adjudicator could likewise conclude that Guzman failed to establish that he could not reasonably obtain corroboration from his sister. To be sure, Guzman asserted that his sister lives in a Mexican town with no communication and must walk

30 minutes to an hour to use a public phone.  AR 142.  Yet Guzman conceded that he talks to her "maybe once a year."  *Id.*  And he said that she would have critical evidence: She knew of the stepfather's abuse and was subjected to it herself.  AR 140, 142.  Despite the obvious value of her recollection, Guzman again provided no evidence that he even *asked* her for a letter.  By his own estimate, however, he would have talked to his sister at least three times over the course of his lengthy immigration proceedings.  *Cf. Shkabari*, 427 F.3d at 331.

In response, the majority asserts that their remote contact proves that Guzman could not "reasonably obtain" evidence from his sister under 8 U.S.C. § 1158(b)(1)(B)(ii).  But *Dorosh* shows that corroboration is reasonably available from individuals even if an immigrant's contact with them is not "convenient, regular, or private."  398 F.3d at 383.  Like the immigrant and her mother in *Dorosh*, Guzman and his sister remained in contact.  Here, Guzman's sister had to walk an hour or less for a phone; there, the immigrant's mother "had to go to the post office" for a phone.  *Id.*  If anything, the Board could reasonably view *Dorosh* as the harder case.  There, the immigrant testified that her mother might put herself in danger by providing help.  *Id.*  Guzman makes no such claim about his sister.

The majority distinguishes *Dorosh* on the ground that the mother in that case had sent an earlier letter.  *See id.*  Yet Guzman offered no evidence that his sister could not send a letter too, if only he had asked for one.  Regardless, the question here is not whether *Dorosh* is distinguishable.  The question is whether a "reasonable adjudicator" could conclude that this case falls within the rule that corroboration is available even when contact is inconvenient or irregular.  8 U.S.C. § 1252(b)(4)(B).  And I do not think any minor factual distinction between this case and *Dorosh* compels the conclusion that the Board's decision on corroboration was unreasonable.  Indeed, after the REAL ID Act, we have upheld a Board's decision to require corroboration from a person with whom an immigrant had "lost contact."  *Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009).  In *Lin*, the Board found that the immigrant "should have made an effort to locate him through his family or friends in China."  *Id.*  Guzman at least was in contact with his sister, so the Board could reasonably conclude that he should have "made an effort" to get evidence from her too.  *Id.*; *cf. Renteria-Cortes v. Holder*, 563 F. App'x 466, 469 (6th Cir. 2014) (per curiam).

*Guzman's Aunt and Uncles*. A reasonable adjudicator lastly could conclude that Guzman could reasonably obtain evidence from his aunt or an uncle. (The immigration judge did not identify the specific uncle that the judge had in mind.) Guzman testified that he "text[s]" "every week" or "every other week" with his aunt and offered no excuse for failing to get a statement from her. AR 125. Similarly, he talked with his uncle who lives in New Jersey three to four weeks before his hearing and again gave no reason why he had not asked for a letter. AR 113. (Guzman did identify his uncle's fear of deportation as a reason why his uncle did not appear in person, but he did not use this as an excuse for the lack of a letter. *Id.*; *cf. Sanchez-Velasco v. Holder*, 593 F.3d 733, 736 (8th Cir. 2010).) Lastly, Guzman identified "communication problems" as the lone reason why he did not have a letter from the uncle who lives on his father's property. AR 143. Yet this conclusory claim does not compel a finding that Guzman could not have obtained a letter from this uncle. Guzman again made no effort to do so. And the alleged "communication problems" did not prevent him from learning facts about his uncle that were useful to his claim for relief, including that his uncle had been threatened by the individuals who murdered his father and so planned to leave his father's property soon. AR 134–35.

The majority does not dispute these points. It instead rejects the Board's decision because "[t]here is nothing in the record . . . indicating that these individuals could have corroborated [Guzman's] claim about abuse by his stepfather." Majority Op. 19. This conclusion does not permit us to overturn the Board's order. To begin with, the majority flips the burden of proof on its head. We have little idea how much (or how little) Guzman's aunt or uncles know of his stepfather's abuse. That evidentiary gap should doom Guzman's request for relief; it should not be a basis to grant it. Because Guzman did not present evidence from his aunt or uncles, he needed to provide an "explanation . . . as to why [the] information was not presented." *S-M-J-*, 21 I. & N. Dec. at 725. Silence does not cut it. And Guzman nowhere offered the reason that the majority now assumes—that these relatives must not have known anything because they lived hours away.

At the least, I would give the word "corroborate" its natural meaning to cover evidence that would "strengthen or confirm" an immigrant's claim or "make [it] more certain." *Black's Law Dictionary*, *supra*, at 421. That is, the statute covers *relevant* evidence—evidence that "has

any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. I would not read the statute, as the majority does, to compel production of only smoking-gun evidence. And statements from Guzman's aunt or uncles would make his abuse claims more plausible, as both the Board and the immigration judge indicated. AR 5, 45–46. The Board found that Guzman had provided "insufficient corroboration" on even basic facts, such as his stepfather's existence. AR 5. Letters from Guzman's aunt or uncles confirming that his father had been murdered and that he had moved with his mother to the small town where his stepfather lived would increase the likelihood that he was telling the truth about the abuse too. Not only that, Guzman testified that his "aunt is the one who [gave him] the deal to come into [the] United States." AR 106. Given that she got him this "deal," a reasonable adjudicator could conclude that she had information about why he had fled his home.

B

To overturn the Board's corroboration decision, the majority also adopts a new legal rule that draws us deeper into a circuit conflict. My colleagues hold that the immigration judge should have given Guzman a chance to explain why he did not corroborate certain facts (such as his stepfather's existence) by specifically asking him at the hearing about the lack of corroboration for those facts. I would reject this rule for procedural and substantive reasons.

1. Start with process. Guzman did not preserve this alleged error. For one thing, as noted, we may review an alleged error only if an immigrant "has exhausted all administrative remedies available." 8 U.S.C. § 1252(d)(1). We have even repeatedly read § 1252(d)(1) as limiting our "jurisdiction." *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004); *Saleh v. Barr*, 795 F. App'x 410, 421 (6th Cir. 2019) (Murphy, J., concurring) (collecting cases). This jurisdictional bar also covers procedural claims that an immigrant fails to raise with the Board, such as the claim that a judge "failed to develop the record by denying [an immigrant] the opportunity to explain the lack of corroborative evidence[.]" *Xuefang He v. Holder*, 502 F. App'x 430, 434 (6th Cir. 2012). I read this caselaw as precluding the majority's legal rule in this case. The immigration judge's decision noted that Guzman did not corroborate various facts, including his stepfather's existence and marriage to his mother. AR 46. Before the Board, Guzman did not claim that the judge failed to give him the opportunity to explain the lack of

corroborating evidence. Guzman argued that he adequately explained why he could not reasonably obtain that evidence. AR 20–21. So we lack jurisdiction to adopt this new rule. And while I doubt that exhaustion is jurisdictional, *Saleh*, 795 F. App'x at 421–23 (Murphy, J., concurring), we are bound by our precedent.

For another thing, we generally do not consider arguments when parties do not advocate for them. *McKinney v. Hoffner*, 830 F.3d 363, 374 (6th Cir. 2016). Here too, Guzman "*never*" raised this argument even before our court. *Id.* Instead, Guzman claims he should have been provided an opportunity to obtain corroborating evidence. Pet. Br. 18. Yet he acknowledges that we have held that the corroboration statute, 8 U.S.C. § 1158(b)(1)(B)(ii), does not give him this right. *Id.* (discussing *Gaye v. Lynch*, 788 F.3d 519, 530 (6th Cir. 2015)). And while Guzman argues that *Gaye*'s holding violates due process, he recognizes that we are bound by that decision and only "reserves the right to seek *en banc* review[.]" *Id.*

2. Turn to substance. As a refresher, the corroboration statute provides: "Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain" it. 8 U.S.C. § 1158(b)(1)(B)(ii). "[A] circuit split exists" over the meaning of this text. *Saravia v. Att'y Gen.*, 905 F.3d 729, 738 (3d Cir. 2018). The Ninth and Third Circuits have noted that this corroboration command kicks in only if ("where") a judge decides that an immigrant should provide corroboration. *Ren v. Holder*, 648 F.3d 1079, 1091–93 (9th Cir. 2011). These courts read this text as requiring a judge first to decide on the need for corroboration, then to give immigrants "notice of the corroboration required, and an opportunity to either provide that corroboration or explain why [they] cannot do so." *Id.* at 1091–92; *Saravia*, 905 F.3d at 737–38.

Five other circuits have noted that the text says nothing about this notice. *See, e.g.*, *Gaye*, 788 F.3d at 530. They have added that the statute and the agency's instructions for completing applications give general notice that immigrants must provide corroboration. *See Avelar-Oliva v. Barr*, 954 F.3d 757, 769–71 (5th Cir. 2020). These courts thus reject the view that judges must "provide additional *advance* notice of the specific corroborating evidence necessary to meet the applicant's burden of proof and an *automatic* continuance for the applicant to obtain such

evidence." *Id.* at 771; *Uzodinma v. Barr*, 951 F.3d 960, 966 (8th Cir. 2020); *Liu v. Holder*, 575 F.3d 193, 198 (2d Cir. 2009); *Rapheal v. Mukasey*, 533 F.3d 521, 530 (7th Cir. 2008). We adopted this approach in *Gaye*, holding that immigrants are not entitled "to notice from [immigration judges] as to what sort of evidence [they] must produce to carry" their burden. 788 F.3d at 530.

The majority opinion limits *Gaye*'s scope and, in my view, mistakenly opens a third strand to this conflict. It holds that an immigration judge may not rule against an immigrant based on the absence of corroborating evidence for a *specific fact* unless the judge ensures that the immigrant is asked at the hearing to explain why the immigrant has not corroborated that fact. Majority Op. 12–13. For both textual and precedential reasons, I disagree with this rule.

To begin with, my colleagues' middle path finds no support in the statute's text. 8 U.S.C. § 1158(b)(1)(B)(ii). The Ninth Circuit found a notice command in this text based on its structure requiring immigrants to provide corroboration only "where" (i.e., "if") a judge decides they must. *See Ren*, 648 F.3d at 1091. *Gaye* rejected that interpretation. 788 F.3d at 529–30. Yet the majority adopts the very same reading that *Gaye* rejected, reasoning (like the Ninth Circuit) that the text operates "sequentially." *Compare* Majority Op. 9, *with Ren*, 648 F.3d at 1091, 1093. As we said before, "[t]his text does not suggest that the alien is entitled to notice from the [immigration judge] as to what evidence the alien must present." *Gaye*, 788 F.3d at 530. And I do not see how the text can entitle immigrants to notice for some purposes (to explain why the evidence is unavailable), but not to notice for others (to obtain the evidence). Either the text entitles immigrants to notice of the required corroboration or it does not. We should not "render [the] statute a chameleon." *See Clark v. Martinez*, 543 U.S. 371, 382 (2005).

In addition, my colleagues' rule seems "inconsistent with the normal procedures for conducting immigration court proceedings." *Matter of L-A-C-*, 26 I. & N. Dec. 516, 520 (BIA 2015). While immigration judges may render oral decisions at the end of the hearing, they also may issue written decisions later. *See* 8 C.F.R. §§ 1240.12–.13. A judge might, for example, want to review the testimony in detail instead of making an immediate judgment call. So the judge may not identify the specific facts that an immigrant should have corroborated until "days after the hearing" when the judge "weigh[s] the evidence and prepare[s] an opinion." *Liu*,

575 F.3d at 198. Immigration judges should not have to hold a second hearing in that circumstance, adding to their "overburdened" dockets. *Rapheal*, 533 F.3d at 530; *see Gaye*, 788 F.3d at 529. Instead, the Board has told immigration judges that they have discretion over how to manage hearings. *L-A-C-*, 26 I. & N. Dec. at 522. I would not read the corroboration statute as departing from that background principle by imposing "rigid requirements for the consideration of corroboration." *Id.* at 524.

My colleagues next mistakenly suggest that the circuit precedent on *Gaye*'s side of this conflict supports their rule. Yes, some cases say that "[w]hen an asylum applicant must provide corroborating evidence, the [immigration judge] must afford an opportunity to explain its unavailability, ensuring the explanation is in the record." *Uzodinma*, 951 F.3d at 966 (citing *L-A-C-*, 26 I. & N. Dec. at 521–22). By this language, though, these courts did not conclude that judges must identify *at the hearing* the facts that immigrants should corroborate so that they may explain why they cannot reasonably obtain corroboration for those facts. Instead, the courts meant only that immigrants should have an opportunity to explain why they lack corroboration on their own initiative—"without prompting" from the judge. *Liu*, 575 F.3d at 198. As the Eighth Circuit said, "[a]t a merits hearing, the [judge] need not identify the specific corroborating evidence that would be persuasive." *Uzodinma*, 951 F.3d at 966. Or as the Seventh Circuit noted, an immigration judge is "not *required* to independently ask" for corroborating evidence before ruling against the immigrant due to the lack of such evidence. *Ruptash v. Holder*, 525 F. App'x 491, 495 (7th Cir. 2013) (order) (citing *Rapheal*, 533 F.3d at 530).

The Second Circuit's *Liu* decision best proves this point. *See* 575 F.3d at 198. There, the immigration judge denied an application for withholding of removal, citing "Liu's failure to submit letters from his wife" and others. *Id.* at 195. The judge "did not remark on these omissions during the hearing, nor did he ask Liu to explain them." *Id.* The Board affirmed because the record did not show that the evidence was unavailable and Liu did not explain its absence. *Id.* The Second Circuit denied Liu's petition for review. It noted that immigration judges should identify "'specific pieces of missing, relevant documentation' and 'show[] that this documentation was reasonably available.'" *Id.* at 198 (citation omitted). And it said that an immigrant must "have an opportunity to explain the omission" and that the judge "must assess

any explanation that is given." *Id.* It then said: "But though we require an [immigration judge] to specify the points of testimony that require corroboration, we have not held that this must be done *prior* to the [immigration judge's] disposition of the alien's claim." *Id.* The court reasoned that a judge "may not determine that corroboration is necessary until all the evidence is in" and the judge "has had an opportunity to weigh the evidence and prepare an opinion." *Id.* It thus held that an immigrant "bears the ultimate burden of introducing such evidence without prompting from the" judge. *Id.* And while this case did not interpret the Real ID Act's corroboration provision, *id.* at 197, the Second Circuit follows the same rules in applying the statute, *Wei Sun v. Sessions*, 883 F.3d 23, 30–31 (2d Cir. 2018).

Now compare *Liu* to this case. Unlike Liu, Guzman was asked to explain the lack of corroboration. He was separately asked why he failed to obtain evidence from his sister, from his mother, from his aunt, from his uncle in Mexico, and from his uncle in New Jersey. AR 113, 125, 142–43. He tried to explain the lack of corroboration but did not adequately do so. And I would not read the statute as requiring the immigration judge to ask Guzman why he did not introduce corroborating evidence for each specific fact that the judge thought should be corroborated.

\* \* \*

To summarize: The majority holds that every reasonable adjudicator would be forced to find that Guzman could not reasonably obtain corroboration, even though Guzman admitted that he never tried to get evidence. It relies on an excuse (illiteracy) that we have repeatedly rejected. It uses gaps in the record to favor Guzman over the Board even though Guzman bears the burden of proof. It interprets the statute to bar the Board from requiring corroboration of background evidence even if an immigrant could readily obtain it. And it imposes rigid new procedural mandates on immigration judges—deepening a circuit split in the process. All told, the majority's logic goes a long way toward jettisoning the choices Congress made in the REAL ID Act.

C

Because I would resolve this case on corroboration grounds, I would not reach the question about the withholding-of-removal statute's causation test. That question is difficult, as evidenced by the circuit split it has produced. *Compare Barajas-Romero v. Lynch*, 846 F.3d 351, 356–60 (9th Cir. 2017), *with Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 n.6 (3d Cir. 2015). Because the majority has resolved it, however, I offer a few competing thoughts.

The withholding-of-removal statute requires proof that a persecutor would threaten an immigrant's "life or freedom" "*because of*" a covered trait—whether "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (emphasis added). In this respect the statute follows the asylum statute, which covers "refugees" who cannot return to their country due to "a well-founded fear of persecution *on account of* race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A) (emphasis added); *see id.* § 1158(b)(1)(A). Both statutes make a persecutor's "motive critical." *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Yet "[p]ersecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected [by the withholding-of-removal statute] and others not." *See In re S-P-*, 21 I & N. Dec. 486, 494 (BIA 1996) (en banc). What happens if a persecutor threatens harm for "mixed motives"—one of which the statute covers (say, the victim's race) and another of which it does not (say, the victim's wealth)?

This mixed-motives problem pops up in many contexts and has produced differing results. Courts have sometimes suggested that a statutorily covered motive must be the *sole* motive for a defendant's action. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177–78 (6th Cir. 1996), *overruled by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–15 (6th Cir. 2012) (en banc). That standard would exclude persecutors who threaten victims for mixed motives (say, because of race and wealth). But in other circumstances courts have suggested that the statutorily covered motive need only play a "motivating part" or be a "motivating factor" in a defendant's action. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 249–50 (1989) (plurality op.). That standard would include all persecutors who act in part for a covered motive (race) even if they also would make the identical threat for an uncovered motive (wealth). *Cf. id.* at

246 n.11. In between these two poles, courts have more recently analogized to tort law's but-for causation, holding that a statutorily covered motive must be a "but-for reason" of the defendant's action. *United States v. Miller*, 767 F.3d 585, 591 (6th Cir. 2014). That standard would also include persecutors who act for covered (race) and uncovered motives (wealth)—but only if the covered motive caused the persecutor's threats such that those threats would not occur *but for* that motive. *Id.* at 591–92.

1. This background sets the stage for the question presented: Which approach best fits the withholding-of-removal statute? I would choose the middle option. An immigrant must prove that a trait protected by the withholding-of-removal statute would be a "but-for reason" of the threatened harm. *Id.* at 591. In other words, an immigrant must prove that a persecutor (here, Guzman's stepfather) would not threaten harm "but for" the motive on which the immigrant relies (here, Guzman's family relationships). Both text and precedent drive my conclusion.

As always, begin with the plain meaning of the words Congress has chosen. *See Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175–76 (2009). Immigrants must show that a persecutor threatened harm "because of" a statutorily covered reason. 8 U.S.C. § 1231(b)(3)(A). This phrase typically means "by reason of" or "on account of." *See American Heritage Dictionary*, *supra*, at 159; *Merriam-Webster's Collegiate Dictionary*, *supra*, at 108. "In everyday usage," the phrase "indicates a but-for causal link between the action that comes before it and the circumstance that comes afterwards." *Miller*, 767 F.3d at 591. In the withholding-of-removal context, for example, one would not naturally say that a persecutor threatened harm "because of" an immigrant's relationship to his father if the persecutor would have threatened the exact same harm even if the immigrant had a different father. *Cf. Elias-Zacarias*, 502 U.S. at 483.

Substantial precedent supports this conclusion. "[T]he Supreme Court has 'insiste[d]'" that the phrase "because of" in a statute "require[s] a showing of 'but-for causality.'" *Miller*, 767 F.3d at 591 (quoting *Burrage v. United States*, 571 U.S. 204, 213 (2014)). Consider the Age Discrimination in Employment Act, which bars discrimination "because of" an employee's age. 29 U.S.C. § 623(a)(1). The Supreme Court held that an employee "must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176. Courts have

extended this logic to many other civil-rights statutes. *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1013–17 (2020); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347, 352 (2013); *Lewis*, 681 F.3d at 321. Or take the hate-crime statute, which bars a defendant from harming a victim "because of" the victim's religion or other protected trait. 18 U.S.C. § 249(a)(2)(A). Our court has held that this criminal law requires the government to prove that the aggressor "would not have acted *but for* the victim's actual or perceived religious beliefs." *Miller*, 767 F.3d at 591.

In short, both text and precedent show that the withholding-of-removal statute's use of "because of" unambiguously requires a statutorily covered motive to be a but-for motive.

2. To reach a contrary result, the majority follows the Ninth Circuit. *See Barajas-Romero*, 846 F.3d at 356–60. That court relied on neither the text of § 1231(b)(3)(A) nor precedent interpreting "because of." It instead cited two changes the REAL ID Act made to other provisions. Change One: The Act, as noted, added subparagraph (C) to the withholding-of-removal statute to incorporate the asylum statute's credibility and corroboration rules in § 1158(b)(1)(B)(ii)–(iii). 8 U.S.C. § 1231(b)(3)(C). Because subparagraph (C) uses the phrase "a reason" when cross-referencing these asylum provisions, the Ninth Circuit found that the withholding-of-removal statute must adopt a causation test that requires a statutorily covered trait to be only *a* reason (not a *but-for* reason) for threatened harm. Change Two: Subparagraph (C) does not cross-reference the new causation standard that the REAL ID Act added to the asylum statute: "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." *Id.* § 1158(b)(1)(B)(i). Because the asylum statute says "one central reason" and the withholding-of-removal statute says "a reason," the Ninth Circuit held, Congress must have intentionally adopted a weaker motive test for withholding-of-removal claims. *Barajas-Romero*, 846 F.3d at 358–60.

Neither change justifies the Ninth Circuit's departure from the usual meaning of "because of." To begin, the words "a reason" in subparagraph (C) say nothing about the causation test for withholding-of-removal claims. Subparagraph (C) provides: "In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in

subparagraph (A), the trier of fact shall" follow the corroboration and credibility rules in § 1158(b)(1)(B)(ii)–(iii). 8 U.S.C. § 1231(b)(3)(C). The Ninth Circuit plucked "a reason" out of context as if this subparagraph read: "An alien must prove that a characteristic identified in subparagraph (A) is a reason that the alien's life or freedom would be threatened." The subparagraph does not say that. Its dependent clause instead explains when to use the procedures subparagraph (C) cross-references: when judges are deciding whether an immigrant's "life or freedom would be threatened for a reason described in subparagraph (A)." The word "for" means "because of" so subparagraph (C) simply mirrors subparagraph (A). *Merriam-Webster's Collegiate Dictionary*, *supra*, at 488. Congress also would not hide a *substantive* change to the statute in the dependent clause of a subparagraph about the *procedures* for resolving claims. Confirming that this subparagraph concerns only process, Congress entitled it: "Sustaining burden of proof; credibility determinations." 119 Stat. at 304; Scalia & Garner, *supra*, at 221. The subparagraph thus gives us no ground to depart from the plain meaning of "because of" or the decisions holding that this phrase requires a statutory reason to be a but-for reason. *See Miller*, 767 F.3d at 591–92.

Turning to the second change, I agree that the REAL ID Act did not add the asylum statute's new central-reason test to the withholding-of-removal statute. *Barajas-Romero*, 846 F.3d at 358–59. Congress made that change in § 1158(b)(1)(B)*(i)*, but the withholding-of-removal statute cross-references only (b)(1)(B)*(ii)* and *(iii)*. 8 U.S.C. § 1231(b)(3)(C). "[W]here, as here, Congress has simultaneously chosen to amend one statute in one way and a second statute in another way, we normally assume the differences in language imply differences in meaning." *Comcast*, 140 S. Ct. at 1018. Just as Congress adopted a motivating-factor test for Title VII but not for the ADEA, *Gross*, 557 U.S. at 174–75, so too Congress adopted a central-reason test for asylum but not for withholding of removal. I thus would not defer to the Board's view that withholding of removal impliedly incorporates the asylum statute's central-reason test. *See Matter of C-T-L-*, 25 I. & N. Dec. 341, 345–48 (BIA 2010). The "practical advantages" of incorporating that language into the withholding-of-removal statute, *id.* at 346, give courts no basis to ignore a statutory text that does not do so. Our role "is to apply the statute as it is written—even if we think some other approach might accor[d] with good policy." *Burrage*, 571 U.S. at 218 (internal quotation marks omitted). Where does that leave us? It means that,

unlike with the asylum statute, courts are left only with the plain meaning of "because of," which requires a statutory reason to be a but-for reason for persecution. *Cf. Gross*, 557 U.S. at 174–77.

The statutory structure points in that direction too. For decades it has been black-letter immigration law that mandatory withholding-of-removal relief requires immigrants to meet a standard *higher* than the standard for discretionary asylum relief. The asylum statute requires only a well-founded fear of persecution on account of a statutorily covered ground; the withholding-of-removal statute requires it to be more likely than not that immigrants would suffer that persecution. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 427–32 (1987). When rejecting withholding claims, therefore, we have said variations of the following on countless occasions: "Because an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility, an alien who fails to qualify for asylum *necessarily* does not qualify for withholding of removal." *Lopez-Arias v. Barr*, 777 F. App'x 793, 797 (6th Cir. 2019) (emphasis added) (quoting *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005)); *e.g.*, *Namo v. Gonzales*, 401 F.3d 453, 456–57 (6th Cir. 2004); *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

If Congress meant to depart from this longstanding immigration structure, it would have done so more clearly than by tucking "a reason" into a subparagraph about something else. After all, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626–27 (2018) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Reading the withholding-of-removal statute instead to require but-for causation comports with this structure. After the REAL ID Act, courts and the Board continue to debate what the central-reason test means. Some decisions suggest that it adopts a more rigorous version of the weak motivating-factor test they applied before the Act. *See Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129–31 (3d Cir. 2009); *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009); *In re J-B-N & S-M*, 24 I & N. Dec. 208, 213–14 (BIA 2007). Other decisions suggest that it should require but-for causation. *See Diaz-Rivas v. U.S. Att'y Gen.*, 769 F. App'x 748, 754 (11th Cir. 2019); *Nicolas-Sebastian v. Barr*, 769 F. App'x 248, 251 (6th Cir. 2019); *Matter of N-M-*, 25 I. & N. Dec. 526, 531 (BIA 2011); *cf. Lopez-Cruz v. Att'y Gen.*, 765 F. App'x 707, 710–11 (3d Cir. 2018) (per

curiam). Either way, reading the withholding-of-removal statute according to its plain text makes those claims no *less* demanding than asylum claims. It thus respects the traditional understanding that withholding-of-removal claims will fail when asylum claims fail. *Lopez-Arias*, 777 F. App'x at 796–97.

One last point. Before the REAL ID Act, "there was no uniform standard for assessing" causation. *J-B-N-*, 24 I. & N. Dec. at 214 n.9 (citing H.R. Rep. No. 109-72, at 163); *cf.* Scalia & Garner, *supra*, at 325. While courts had generally rejected a *sole*-motive test, *e.g.*, *Girma v. INS*, 283 F.3d 664, 667 (5th Cir. 2002), they had not reached consensus on an alternative. Yet one thing stands out from the statutory history. The Ninth Circuit had adopted the weakest causation test, requiring a statutory reason to be only "one reason" for "persecutors' conduct, even if other reasons appeared to have been the dominant cause[.]" *Parussimova*, 555 F.3d at 739 (citing cases). Because Congress threw out that test in the asylum context, *see id.* at 740, we should be wary of choosing that rejected test to govern what has long been the more demanding withholding-of-removal statute. The plain text precludes such a lenient test, so I must respectfully dissent.